Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

John Doe,

                                    Plaintiff,

                - against -

DraftKings Inc.,

                                    Defendant.

Index No:

**SUMMONS**

TO THE ABOVE-NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED to answer the Complaint of the plaintiff herein and to serve a copy of your answer on the plaintiff at the address indicated below within twenty (20) days after service of this Summons, exclusive of the date of service, where service is made by delivery upon you personally within the state, or within thirty (30) days after completion of service where service is made in any other manner, and you are hereby notified that should you fail to answer, a judgment will be taken against you by default for the relief demanded in the Complaint.

Pursuant to Section 503 of the New York Civil Practice Law and Rules, the basis of the venue designated is that it was designated by plaintiff as the venue in which he resides.

1

Dated: March 11, 2024
Long Island City, New York

*Steven Jacobs*

By _____

Steven Jacobs
28-40 Jackson Ave. #26E
Long Island City, NY 11101
(610) 608-3304
stevenbjacobs@gmail.com

Defendants' Address:

DraftKings Inc.
222 Berkley St..
Boston, MA 02116

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

John Doe,

                                                                Plaintiff,

                              - against -

DraftKings Inc.,

                                                                Defendant.

Index No:

**COMPLAINT**

Plaintiff John Doe ("Plaintiff") submits this Complaint against defendant DraftKings Inc. ("Draftkings"), and alleges upon personal knowledge and upon information and belief as follows:

**INTRODUCTION**

1.      On March 30, 2023, Plaintiff left his apartment in Long Island City, New York to go to his office in Manhattan.  In the short walk between his apartment and the subway platform a masked man grabbed him, violently spun him around, and threatened to kill him if he did not pay half a million dollars to an individual named Gadoon "Spanky" Kyrollos (hereinafter referred to as "Spanky").

2.      Spanky and the masked man did not act alone.  Defendant DraftKings knowingly provided Plaintiff's address, as well as Plaintiff's sensitive personal information, financial history, and betting history that caused Spanky to act.  DraftKings loaded the proverbial gun, and put it in Spanky's hand.

3.      Plaintiff's life was never the same.

1

4. This is a case about DraftKings—one of the biggest and most profitable sports betting companies in the world—knowingly and willfully aiding and abetting a violent assault, battery, and death threat, (and later, a significant computer hack).

5. DraftKings' customers, including Plaintiff, rely on DraftKings' sheen of legitimacy as a licensed sportsbook that is omnipresent in television advertisements to trust DraftKings implicitly with their private personal and sensitive financial information. Plaintiff would have never dreamed that DraftKings would willfully conspire with a dangerous man with an ax to grind, intent on doing Plaintiff harm.

6. Yet over the course of the last year, the upper echelon of DraftKings has done exactly that. It has worked with Spanky to severely harass and endanger Plaintiff.

7. To further terrorize Plaintiff, DraftKings has systematically covered up its bad acts, refusing to provide any information to Plaintiff regarding the multiple dangerous incidents in which DraftKings has played a significant part.

8. Enough is enough, Plaintiff brings this action to put a stop to DraftKings' campaign of harassment and to recover for the physical, mental and severe emotional damages he has sustained, as well as to seek punitive damages for DraftKings' malicious, willful and wanton behavior.

## THE PARTIES

9. Plaintiff is an individual residing in Queens County, New York.

10. Defendant DraftKings is a digital sports gambling company, in the business of taking sports bets, incorporated in Delaware and with a principal place of business located at 222 Berkley St., Boston, Massachusetts 02116.

2

## JURISDICTION AND VENUE

11. This Court has subject matter and personal jurisdiction over this action pursuant to CPLR §§ 301 and 302.

12. DraftKings committed the tortious acts set forth below within the state of New York, and caused injury to Defendant in New York while regularly doing and soliciting business in New York (including being licensed in New York) and acting as one of the largest sportsbooks in New York, including in Queens County, since its sports betting operations began in January 2022.

13. DraftKings also regularly does business and solicits business in New York and derives substantial revenue from its business in New York.

14. In addition, DraftKings should have expected its conduct to have consequences in New York and it derives substantial revenue from interstate commerce.

15. Venue is proper in this Court pursuant to CPLR § 503(a) because Queens County is the county in which Plaintiff resides, and the county in which a substantial part of the events giving rise to the claims occurred.

## FACTUAL BACKGROUND

### A. Plaintiff's Initial Relationship with DraftKings Sportsbook.

16. In January 2022 legislation came into effect that legalized mobile sports betting in New York for certain licensed providers. One such provider was DraftKings, which is one of the largest sports betting operators (i.e. legalized bookies) in the world.

17. In or around January 2022, a VIP host at DraftKings, Joe Di Chiaro ("Di Chiaro") contacted Plaintiff in order to recruit him to play on DraftKings in light of the recent legalization

3

of mobile sports gambling in New York. Di Chiaro induced Plaintiff to play substantial volume on DraftKings by offering bonuses and other VIP perks.

18.     As part of the customer relationship, DraftKings gained and retained access to Plaintiff's trust, as well as his personal information, banking history, and financial data. Plaintiff trusted DraftKings implicitly, and his relationship with Di Chiaro became akin to a friendship.

19.     Plaintiff placed bets as a VIP customer of DraftKings for over a year. During that time Plaintiff and Di Chiaro were in regular touch, and had developed a relationship of trust (or, at least, Plaintiff believed they had at the time). Di Chiaro acted as Plaintiff's sole point of contact with DraftKings, and regularly interacted with Plaintiff on the phone and in person at various DraftKings VIP events such as basketball and hockey games in DraftKings' suite at Madison Square Garden in New York, New York.

**B. Plaintiff Informs DraftKings That An Extortionist Claimed To Have Access To The Upper Echelon Of DraftKings And Plaintiff Specifically Requests That DraftKings Protect Plaintiff's Private Information.**

20.     In or around February 2023, Spanky, a prominent sports gambler with nearly fifty thousand followers on social media site X (under the name @spanky), began extorting Plaintiff. Spanky claimed that Plaintiff owed him hundreds of thousands of dollars despite the fact that Plaintiff and Spanky had never met, and had spoken on the phone only twice.

21.     According to FBI archives available online, Spanky has previously been arrested in connection with the use of "threats, intimidation, and even physical force to collect debts." *See* https://archives.fbi.gov/archives/newyork/press-releases/2012/twenty-five-individuals-indicted-in-multi-million-dollar-illegal-nationwide-sports-betting-ring; *see* also https://www.npr.org/transcripts/508588660 ("[O]n the wiretap, McNally could hear Spanky calling up a guy connected to the mob. Spanky wanted to send in some muscle to try to get his money back.").

4

22.     Spanky apparently believed that he was entitled to any funds held in Plaintiff's DraftKings account, and it was clear Spanky would go to any lengths to try to force Plaintiff to pay.

23.     On or around February 28, 2023, Spanky informed Plaintiff that Spanky had acquaintances in the "upper echelon" of DraftKings, and that he was going to attend a conference in Boston, MA at which where DraftKings would provide him any and all information he requested regarding Plaintiff's account.

24.     Spanky explained ominously that "[t]his is a request [he] can only make in person," presumably because it is so patently improper for DraftKings to provide Spanky with Plaintiff's private personal and sensitive financial information.

25.     In the same conversation, Spanky indicated he had dangerous associates, and that defying Spanky would significantly endanger Plaintiff..

26.     In or around early March 2023, Plaintiff promptly reported the contents of his discussion with Spanky to Di Chiaro, who Plaintiff fully trusted at the time.  In particular, Plaintiff reported that Spanky (i) was a very dangerous individual; (ii) had claimed to be connected all the way up to the "upper echelon" of Draftkings; (iii) had claimed that he was going to attend a conference in Boston at which DraftKings would provide him with Plaintiff's private personal and sensitive financial information, including Plaintiff's address, as well as his financial, banking, and betting history; and (iv) that he intended to use information that he received from DraftKings to extort Plaintiff, threaten Plaintiff, and/or potentially injure or kill Plaintiff.

27.     In sum, Plaintiff told Di Chiaro in extremely plain terms that if Plaintiff's private information was not protected by DraftKings, then Plaintiff would be in extreme danger.

5

28.     At the time, Di Chiaro seemed shocked that Spanky claimed to have such access to DraftKings' data (which it was required by law to ensure privacy over).  Di Chiaro understood that divulging such information to Spanky would be extraordinarily improper, and could cause a major problem for the company.  As a result, Di Chiaro said that he would do everything he could to help ensure that nothing was improperly leaked to Spanky or anyone else.

29.     In a subsequent conversation, Di Chiaro said that he had put in place enhanced account security on Plaintiff's account, and reassured Plaintiff that in light of this added security Plaintiff's information was completely safe and secure.  Di Chiaro said that if *anyone* at DraftKings (including anyone in the "upper echelon") were to try to procure any information with respect to Plaintiff's account, Di Chiaro would be able to see it and put a stop to it.

**C.   DraftKings Divulges Plaintiff's Private Information To Spanky, Leading To Death Threat, Assault And Battery.**

30.     The security measures that Di Chiaro claimed to have put into place did not work (if, indeed, he put any security measures in place at all).

31.     In late-March 2023, Plaintiff was contacted by Spanky's associate Oscar Jones ("Jones").  Jones made it abundantly clear in emails and text messages that he and Spanky had received Plaintiff's personal and financial information from DraftKings (including the contexts of Plaintiff's private texts with Di Chiaro, which no one outside of DraftKings and Plaintiff could have possibly known).

32.     A few days later, on March 30, 2023, at approximately 8:45 am, Plaintiff left his apartment building in Long Island City, NY, to board the subway to commute to his office in Manhattan.  As Plaintiff was walking down the steps to the subway platform, he heard a man yelling his name, and felt the man grab his arm from behind.  The man twisted Plaintiff's arm and aggressively spun Plaintiff around on the subway platform.  The man was large, muscular, and

6

covered head to toe in dark clothing, including a black mask that covered his entire face and head (except for his eyes).

33.    The man identified Spanky and Jones as the people that had sent him and told Plaintiff that he had to pay the money that he "owed." The man told Plaintiff that "we know where you live, and we know where you work on Lexington Avenue." The man also said that if Plaintiff did not pay Jones what he claims to be owed, Plaintiff "did not want to know what [the man] would do to [Plaintiff] if [the man] had to come back."

34.    Plaintiff understood this to be a death threat (the "Death Threat") and immediately reported the assault, battery, and Death Threat to the New York Police Department as well as other law enforcement agencies.

35.    Plaintiff also promptly reported the Death Threat to Di Chiaro at DraftKings. Plaintiff explained that the DraftKings leak led directly to the Death Threat because, upon information and belief, DraftKings provided Spanky and/or others with Plaintiff's private account information, address, financial history, and betting history, which gave Spanky the means and desire to send "muscle" to make the Death Threat.

36.    Di Chiaro's attitude appeared to have changed completely since Plaintiff had first reported the danger from Spanky.  Although Di Chiaro spoke sympathetically and acknowledged the security breach at DraftKings, he refused to provide *any information whatsoever* to Plaintiff as to how it happened.  Instead, Di Chiaro stonewalled, claiming that DraftKings' investigation regarding the information that it provided to Spanky was a private internal matter (despite knowing that withholding information from Plaintiff could result in injury or death).

37.    Di Chiaro made it clear that he would not say a single word to Plaintiff regarding DraftKings' investigation into its role in the Death Threat and the surrounding incidents.  Upon

7

information and belief the "upper echelon" of DraftKings ordered Di Chiaro not to provide Plaintiff with any further information regarding DraftKings' wrongful conduct.

38.     It is no coincidence that the Death Threat occurred within days of DraftKings' leak to Spanky and Jones. The Death Threat could not have and would not have happened but for the knowing assistance of the "upper echelon" of DraftKings.

39.     After the Death Threat, Plaintiff's life has not been the same:

a) Plaintiff has lived in a state of constant fear, including in his own home;

b) Plaintiff can no longer enjoy life in New York without being extremely conscious of his surroundings and in fear for his safety. For example, on the advice of law enforcement, Plaintiff:

   i.    Does not go outside alone at night or in sparsely populated areas;

   ii.   Uses alternate entrances and exits at home and at work, and varies his schedule to thwart anyone potentially lying in wait; and

   iii.  Must be constantly vigilant of surroundings, living at all times as if any moment in public could provide an opening for Plaintiff to be attacked, injured or killed.

c) Plaintiff engaged counsel (at significant expense) with experience dealing with violent extortionists;

d) Plaintiff suffered and is still suffering severe emotional distress which, among other things, has caused him to discuss the Death Threat mental health professionals;

e) Plaintiff has trouble sleeping, and is terrified whenever there is a knock on the door or a phone ringing;

8

f) Plaintiff has been hindered in his work at an international law firm due to his constant (reasonable) fear for his own safety as well as the safety of his partner and dog who share his apartment.

g) In sum, Plaintiff has been completely deprived of the ability to enjoy life in public (and, to some degree, in private as well).

40.     Plaintiff subsequently learned that his apartment building was in possession of a security video of the Death Threat (which video was collected by law enforcement), which shows that the masked man who made the Death Threat waited outside his apartment for approximately *three hours* starting in the early morning on March 30, 2023, waiting for Plaintiff to emerge to head for work.

41.     The fact that the perpetrator of the Death Threat would lie in wait for so long terrifies Plaintiff.

**D.   DraftKings Assists Hacker And Engages In Cover-up.**

42.     Notwithstanding Di Chiaro's (nonspecific) reassurances that DraftKings was investigating and addressing the supposedly inadvertent information leak, DraftKings' wrongful conduct and dangerous collaboration with Spanky to harass Plaintiff continued.

43.     Several months after the Death Threat, on October 2, 2023, Plaintiff woke up in the morning and was unable to access his DraftKings account.  According to the DraftKings software, no account existed under Plaintiff's registered email address.  Plaintiff sought assistance from DraftKings by email and through texts to his VIP hosts Di Chiaro and Taylor O'Brien ("O'Brien"), who had taken over responsibility for Plaintiff's account from Di Chiaro.

44.     After some time, DraftKings support responded by email saying:  "[a]fter a little digging, I was able to locate your account . . . On 10-2-23 at 1:32:39 AM EST, our site received a request to update [i.e. to change] your email address and this was approved . . . ."

9

45.     The email failed to provide any further information regarding the supposed request to change Plaintiff's registered email account in the middle of the night, or regarding how such request was possibly "approved."

46.     Changing a registered email address on a DraftKings account has significant consequences, as it gives the holder of the new email address access to all of the accounts funds as well as the personal and financial information of the account holder. For that reason, DraftKings has strict rules that are supposed to be followed in order to change a customer's registered email address.

47.     In particular, DraftKings' rules require (i) an email from the current registered email address requesting the change and listing the new email address, and (ii) a photo of the customer holding his photo ID to be uploaded to DraftKings' secure document portal. On October 2, 2023—the day the email change was allegedly requested and inexplicably approved by DraftKings—Plaintiff neither emailed any request to change his registered email address nor uploaded anything at all to DraftKings' secure document portal.

48.     Thus, there are only two possibilities as to how the request to change Plaintiff's registered email address was "approved" by DraftKings. Either (1) DraftKings intentionally changed the address to assist a bad actor (on information and belief, Spanky); or (2) DraftKings completely neglected to follow its own procedures with respect to changing Plaintiff's registered email. Given the gigantic consequences of changing a registered email address with a licensed sports gambling provider such as DraftKings, the latter is extremely unlikely (and even if it is the case, DraftKings is nevertheless liable for extraordinary negligence and/or recklessness).

49.     Upon information and belief, DraftKings intentionally assisted a hacker in taking control of Plaintiff's DraftKings account.

50.     Later that day, Plaintiff had a call with O'Brien. On the call, O'Brien confirmed that the email address registered on Plaintiff's account had, in fact, been changed to a specific MS Outlook email address that included Plaintiff's last name (the "Imposter Email Address").

51.     Plaintiff did not create or control the Imposter Email Address, had never heard of the Imposter Email Address prior to his call with O'Brien, and had no association with the Imposter Email Address. However, the fact that the Imposter Email Address included Plaintiff's last name demonstrates that this was no random hack—the holder of the Imposter Email Address knew that the relevant DraftKings account belonged specifically to Plaintiff, and also knew Plaintiff's full name.

52.     Plaintiff asked O'Brien to provide (1) the IP address of the attempted login at 1:32:39 AM EST; and (2) information regarding the request to change Plaintiff's registered email to the Imposter Email Address (including how the request to change Plaintiff's email address was made, and how it was conceivably approved)..

53.     O'Brien appeared to understand the seriousness of the situation, and promised he would try to update Plaintiff within hours.

54.     After receiving no response for nearly 24 hours, DraftKings emailed Plaintiff saying that its investigation had concluded and that "all activity has been deemed valid." Notably, despite declaring "all activity valid," DraftKings' email failed to explain how it is was possible that Plaintiff's registered email was "validly" changed to an email address that he had never heard of, or why that change was approved by DraftKings in direct contravention to its own vital policies.

55.     After Plaintiff's initial call with O'Brien, on information and belief, the "upper echelon" of DraftKings ordered Di Chiaro and O'Brien not to provide any further information to Plaintiff (just as it had done with regard to the Death Threat). As a result, over the next week both

11

of Plaintiff's VIP hosts ignored Plaintiff's calls and texts, and refused to provide any information whatsoever.

56.     On October 9, 2023, Plaintiff emailed DraftKings' Chief Legal Officer, Stanton Dodge ("Dodge"), explaining the situation and requesting assistance to get to the bottom of what was happening.  To date, Dodge has not responded.

57.     Plaintiff was stunned that DraftKings would not provide him with relevant information regarding his own account, particularly when DraftKings was well aware of the Death Threat, and well aware of the seriousness attached to turning over Plaintiff's funds and account details to a hostile actor (upon information and belief, Spanky).

58.     After ten days of stonewalling and refusing to provide any information regarding the hack and/or how the email address change was approved, on October 11, 2023 Di Chiaro informed Plaintiff that he could request such information by email to DraftKings' privacy department.  Di Chiaro did not provide any explanation as to why it took him *ten days* to simply provide an email address for the (allegedly) relevant department.  Plaintiff requested such information by email the same day.

59.     Around the same time Di Chiaro suddenly and without explanation informed Plaintiff that DraftKings was "revok[ing] [his] VIP status, inclusive of all VIP perks, bonuses & benefits . . . ."  Plaintiff had spent hundreds of thousands of dollars earning his status on DraftKings, largely as a result of representations from Di Chiaro regarding such significant bonuses and VIP treatment.  Such representations were apparently entirely false.

60.     On information and belief, DraftKings revoked Plaintiff's VIP status so he would no longer have access to discussions with VIP hosts, as it became clear to DraftKings that Plaintiff

would not rest until he was provided with the information that he needed to ensure his own safety (and which DraftKings plainly did not want to provide).

61.     DraftKings' Privacy Department did not respond for *over a month*.

62.     Throughout that month and at all relevant times since the Death Threat, Plaintiff has lived in constant fear for his safety. That fear has significantly worsened due to the fact that DraftKings was and is clearly still working with Spanky (and/or other bad actors) against Plaintiff.

63.     On November 13, 2023 DraftKings' Privacy Department sent Plaintiff six files that were supposedly responsive to Plaintiff's information requests. However, in sum and substance these files are nothing more than indecipherable spreadsheets that do not answer any of the key questions regarding the hack.

64.     After reviewing the files, on November 14, 2023, Plaintiff responded "[t]hanks, but this is totally non-responsive. Please reread my initial email about [DrafKings] granting unauthorized access to my account to [the Imposter Email Address]. In particular I need . . . information regarding how and why the request to change my registered email to the [Imposter Email Address] was granted, when I provided no documentation or authorization to do so."

65.     On November 16, 2023 DraftKings responded by saying in relevant part "[w]e are not able to provide any information regarding internal policies or investigations at this time."

66.     On November 17, 2023 Plaintiff pleaded with DraftKings to reconsider, explaining that the Imposter Email Address was plainly set up by dangerous people in order to to steal Plaintiff's identity. DraftKings never responded or provided any additional information.

67.     Upon information and belief, the upper echelon of DraftKings assisted Spanky (or someone working with Spanky) to hack Plaintiff's DraftKings account on October 2, 2023 (just as

13

DraftKings aided and abetted Spanky and his masked thug in making the Death Threat on March 30, 2023).

68.     Upon information and belief, the upper echelon of DraftKings engaged in a systematic cover-up regarding both incidents. Among other things, the cover-up was designed to gaslight Plaintiff by falsely claiming that "all activity was valid" and cause further distress.

69.     Upon information and belief, any and all of DraftKings' employees that divulged information to Spanky, Jones and/or others, or that aided and abetted the Death Threat and the hack against Plaintiff in any way, were acting within the scope of their employment at DraftKings.

70.     Upon information and belief, DraftKings knowingly and willfully collaborated with Spanky and his associates in a year-long deliberate and malicious campaign of harassment and intimidation against Plaintiff, as set forth above.

71.     The campaign of harassment against Plaintiff has worked, as Plaintiff has been terrified for his safety ever since the Death Threat.

### FIRST CAUSE OF ACTION
**(Aiding and Abetting Assault)**

72.     Plaintiff repeats the allegations contained in the preceding paragraphs as though set forth in full herein.

73.     The Death Threat described above constituted an assault against Plaintiff and caused severe injury to Plaintiff.

74.     Prior to the Death Threat, as a result of Plaintiff's discussions with Di Chiaro set forth above, DraftKings knew that Spanky was a dangerous individual who intended to use any of Plaintiff's private information that Spanky received from DraftKings to extort, injure, and/or kill Plaintiff.

75.     DraftKings nevertheless divulged Plaintiff's private personal and financial information to Spanky, including Plaintiff's address where the Death Threat ultimately took place, financial history, and betting history, despite knowing that Spanky intended to use it to extort, injure, and/or kill Plaintiff.

76.     The Death Threat would not have occurred but for the substantial and knowing assistance provided by DraftKings. Indeed, DraftKings divulged to Spanky and Jones information that provided both the means to extort, injure and/or kill Plaintiff, as well as the desire to do the same.

77.     As a direct result of the foregoing, Plaintiff sustained physical, emotional, and psychological injuries, along with pain and suffering.

78.     DraftKings' conduct toward Plaintiff was so malicious, willful and wanton and/or involved a reckless or conscious disregard of the health and safety of Plaintiff, so as to give rise to punitive damages.

<u>SECOND CAUSE OF ACTION</u>
**(Aiding and Abetting Battery)**

79.     Plaintiff repeats the allegations contained in the preceding paragraphs as though set forth in full herein.

80.     The Death Threat described above constituted a battery against Plaintiff and caused severe injury to Plaintiff.

81.     Prior to the Death Threat, as a result of Plaintiff's discussions with Di Chiaro set forth above, DraftKings knew that Spanky was a dangerous individual who intended to use any of Plaintiff's private information that Spanky received from DraftKings to extort, injure, and/or kill Plaintiff.

15

82.     DraftKings nevertheless divulged Plaintiff's private personal and financial information to Spanky, including Plaintiff's address where the Death Threat ultimately took place, financial history, and betting history, despite knowing that Spanky intended to use it to extort, injure, and/or kill Plaintiff.

83.     The Death Threat would not have occurred but for the substantial and knowing assistance provided by DraftKings. Indeed, DraftKings divulged to Spanky and Jones information that provided both the means to extort, injure and/or kill Plaintiff, as well as the desire to do the same.

84.     As a direct result of the foregoing, Plaintiff sustained physical, emotional, and psychological injuries, along with pain and suffering.

85.     DraftKings' conduct toward Plaintiff was so malicious, willful and wanton and/or involved a reckless or conscious disregard of the health and safety of Plaintiff, so as to give rise to punitive damages.

### THIRD CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

86.     Plaintiff repeats the allegations contained in the preceding paragraphs as though set forth in full herein.

87.     Plaintiff trusted DraftKings with his money and personal data, relying on DraftKings' reputation and promises regarding security. Plaintiff would have never dreamed that DraftKings would purposefully endanger Plaintiff.

88.     As a result of Plaintiff's discussions with Di Chiaro set forth above, DraftKings knew that Spanky was a dangerous individual who intended to use any information that he received from DraftKings to extort, injure, and/or kill Plaintiff.

16

89.    DraftKings nevertheless divulged Plaintiff's private personal and financial information to Spanky, including Plaintiff's address where the Death Threat ultimately took place, and financial history, despite knowing that Spanky intended to use it to extort, injure, and/or kill Plaintiff.

90.    DraftKings' betrayal of Plaintiff's trust as well as its conduct as described above— namely working with Spanky and others to systematically harm and terrorize Plaintiff over the course of a full year—is extreme and outrageous, exceeds all bounds of decency and is utterly intolerable in a civilized society.

91.    Indeed, DraftKings divulged to Spanky and Jones information that provided both the means to extort, injure and/or kill Plaintiff, as well as the desire to do the same.

92.    Moreover, even after being made aware of the Death Threat, DraftKings continued to work with Spanky to endanger Plaintiff, including by changing Plaintiff's registered DraftKings email address, putting at risk all of Plaintiff's funds, financial history, banking history, and personal information.

93.    In engaging in the conduct set forth above, DraftKings intended to cause Plaintiff severe emotional distress or consciously disregarded a substantial probability of causing Plaintiff severe emotional distress.

94.    The cover-up DraftKings engaged in regarding the Death Threat and the hack caused further severe distress.  As a result of the cover-up, DraftKings' conduct that caused Plaintiff severe emotional distress is ongoing.

95.    As a direct and proximate result of the foregoing, Plaintiff sustained severe emotional distress and psychological injuries, along with pain and suffering.

96.     DraftKings' conduct toward Plaintiff was so malicious, willful and wanton and/or involved a reckless or conscious disregard of the health and safety of Plaintiff, so as to give rise to punitive damages.

### FOURTH CAUSE OF ACTION
**(Negligence, Negligent Supervision and Retention, Negligent Infliction of Emotional Distress)**

97.     Plaintiff repeats the allegations contained in the preceding paragraphs as though set forth in full herein.

98.     As set forth above, upon information and belief any and all of DraftKings' employees that divulged information to Spanky or his henchman Jones, or that worked with Spanky and Jones to cause the Death Threat and the hack against Plaintiff, were acting intentionally and within the scope of their employment at DraftKings.

99.     However, to the extent DraftKings argues that any of its employees' conduct vis-à-vis Plaintiff was beyond the scope of their employment, DraftKings is nevertheless alternatively liable under theories of negligence, including negligent hiring, training, supervision, and retention.

100.    As a result of Plaintiff's discussions with Di Chiaro prior to the Death Threat, DraftKings knew or reasonably should have known that its "upper echelon" was intending to and had a propensity to improperly divulge Plaintiff's private account information (including his address, banking history, financial history, betting history and even his texting history with Di Chiaro) to Spanky and/or other hostile actors.

101.    As a result of Plaintiff's discussions with Di Chiaro prior to the Death Threat Draftkings knew or reasonably should have known that divulging Plaintiff's private account information (including his address, banking history, financial history, betting history and texting history with Di Chiaro) to Spanky and/or other hostile actors would put Plaintiff in danger of severe injury and/or death.

102.     After the Death Threat and DraftKings' internal coverup of its participation in the Death Threat, and despite full knowledge regarding the Death Threat, DraftKings nonetheless continued to employ people—including in its upper echelon—who had the propensity to provide private information to Spanky and/or other hostile actors, including full access to Plaintiff's account in connection with the October 2, 2023 hack.

103.     DraftKings had a duty of care to properly hire, train, retain, supervise and discipline their employees to avoid unreasonable harm to others and to take steps to alleviate harm caused by one's affirmative conduct.  In particular, DraftKings had a duty of care to properly hire, train, retain, supervise and discipline their employees to ensure that employees would *never* (i) assist with an assault, battery and death threat or (ii) improperly change the registered email address on an account without following proper procedures, thereby allowing the holder of the imposter email to access all funds and account information.

104.     DraftKings breached its duty of care by way of its own conduct alleged herein, including but not limited to failing to terminate anyone and everyone, including the "upper echelon" of DraftKings that committed the conduct referenced herein, or to take steps to warn Plaintiff and anyone else with a DraftKings account of the substantial and unacceptable risks of providing information and money to DraftKings (i.e. that DraftKings will work with dangerous bad actors who are intent on doing customers harm).

105.     As a direct result of the foregoing, Plaintiff sustained physical, emotional, and psychological injuries, including significant and reasonable fear for his own safety, along with pain and suffering.

19

106.     DraftKings' conduct toward Plaintiff was so malicious, willful and wanton and/or involved a reckless or conscious disregard of the health and safety of Plaintiff, so as to give rise to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment in his favor and against Plaintiff as follows:

a)  A judgment finding DraftKings liable to Plaintiff as set forth above;

b)  A judgment awarding Plaintiff compensatory damages in an amount to be proven at trial but no less than $1 million;

c)  A judgment imposing an award of punitive damages against DraftKings and in favor of Plaintiff in an amount to be proven at trial in connection with each Count for which DraftKings is liable;

d)  Pre- and post-judgment interest;

e)  Reasonable attorneys' fees, costs, and disbursements;

f)  Such other and further relief in Plaintiff's favor as this Court deems necessary, just and proper.

Dated: March 11, 2024
Long Island City, New York

*Steven Jacobs*

By _____
Steven B. Jacobs
Attorney for Plaintiff
28-40 Jackson Ave. #26E
Long Island City, NY 11101
(610) 608-3304
stevenbjacobs@gmail.com

20