# Coblentz
# Patch Duffy
# & Bass LLP

One Montgomery Street, Suite 3000
San Francisco, CA 94104-5500

T 415 391 4800

coblentzlaw.com

Rees F. Morgan
D (415) 772-5754
rmorgan@coblentzlaw.com

October 21, 2024

<u>VIA ECF FILING</u>

The Hon. Natasha C. Merle, USDJ
United States District Court for the Eastern
District of New York
Theodore Roosevelt United States
Courthouse 225 Cadman Plaza East
Brooklyn, NY  11201

Re:     <u>*Steven Jacobs v. DraftKings Inc.*</u>; Case No. 1:24-cv-03077-NCM-VMS

Dear Judge Merle:

Defendant DraftKings, Inc. ("DraftKings") writes to oppose Plaintiff's October 14, 2024 request (ECF No. 35) for an informal conference (i) to compel DraftKings to comply with the Court's August 12 Order; and (ii) to discuss Plaintiff's attempt to amend his complaint while DraftKings' motion to dismiss (filed on June 28, 2024) is still pending.  The Court should deny the request because (i) DraftKings has complied with the August 12 Order; and (ii) Plaintiff's proposed amendment is futile.  The motion to dismiss should be decided *before* any decision on Plaintiff's request for leave to amend.

***Compliance with August 12 Order***:  In its August 12, 2024 Order, the Court ordered that "[t]he parties should exchange paper discovery related to Plaintiff's account; all other discovery is stayed pending the outcome of the motion to dismiss."  DraftKings has fully complied with the Court's August 12 Order.  In meeting and conferring with Plaintiff about the Order, DraftKings agreed to produce documents (including electronically stored documents, which arguably weren't captured by the Court's order) in response to 18 of Plaintiff's Requests for Production ("RFPs").[1]  Following a reasonable and diligent investigation, DraftKings identified six custodians likely to have documents regarding Plaintiff's account: three "hosts" that communicated directly with Plaintiff about his account and three other employees who investigated Plaintiff's claims that his account had been compromised.  DraftKings used search terms to locate potentially responsive information that were *broader* than the terms that Plaintiff himself proposed and DraftKings began rolling document productions on September 13, 2024.  Since then, DraftKings has produced nonprivileged responsive materials on September 20, October 1, and October 18, and expects to complete its production on or around November 4, 2024.  Because

---

[1] Plaintiff himself proposed this list of 18 RFPs.

Coblentz
Patch Duffy
& Bass LLP

The Hon. Natasha C. Merle, USDJ
October 21, 2024
Page 2

DraftKings has fulfilled its obligations, the Court need not compel DraftKings to comply with its August 12 Order.

Plaintiff appears to suggest that DraftKings has failed to comply with the August 12 Order in three ways. First, Plaintiff demanded that DraftKings search *its entire corporate database* for any reference to his name. DraftKings is not required to do so. Collecting *every* email to and from over 4,000 DraftKings employees and every electronic record to run such a search—much less review the results—is grossly disproportionate to the needs of the case.

Second, after apparently abandoning that position, Plaintiff demanded that DraftKings include as custodians not just his hosts but also "anyone else" that spoke with those hosts and some of DraftKings' highest-level executives: DraftKings' Chief Executive Officer and Chairman of the Board (Jason Robins), its Chief Legal Officer (Stanton Dodge), and Race and Sports Operations Director Johnny Avello. *See* Pltf's Letter, Ex. A. In response, DraftKings discovered three custodians who spoke with Plaintiff's hosts about Plaintiff and investigated Plaintiffs' allegations of account tampering, which DraftKings agreed to add as custodians. But DraftKings is not required to include Mr. Robins, Mr. Dodge or Mr. Avello as custodians. Such a request is improper and harassing. We are aware of no basis to add them as custodians. The August 12 Order requires production of documents related to Plaintiff's account, not any document that could potentially relate to any of Plaintiff's claims, like those surrounding conferences that senior DraftKings executives allegedly attended and the purported mastermind behind an alleged third party assault (Mr. Kyrollos). Plaintiff has provided no basis – nor are we aware of one – to suggest that Messrs. Robins, Dodge, and Avello would have any information about Plaintiff's account and, as to Mr. Dodge, any such communications likely would be privileged. Given their level of seniority, Plaintiff must – but has not and cannot – demonstrate that any of them "are likely to be the *exclusive* holders of responsive documents." *In re Morgan Stanley Mortgate Pass-Through Certificates Litigation*, No. 09-CV-012137 (LTS) (SN), 2013 WL 4838796 at *2 (S.D.N.Y. Sept.11, 2013) (emphasis added). Just because DraftKings' CEO (Mr. Robins) or one of its directors (Mr. Avello) allegedly attended conferences that Mr. Kyrollos also attended is simply insufficient to add them as custodians. With regard to DraftKings' Chief Legal Officer (Mr. Dodge), no allegations in the complaint or other documents suggest that he had any relationship with, or knowledge of, Plaintiff before the complaint was filed. Furthermore, any internal emails to him regarding the allegations would, again, almost certainly be attorney-client-privileged communications and/or protected attorney work product.

Third, Plaintiff argues that DraftKings has not complied with the August 12 Order because he claims he has received less than 200 documents. There is nothing surprising about that volume of documents, given the August 12 Order limited paper discovery to a single DraftKings' customer's account. To date Plaintiff has received documents related to his wagering, deposit, and withdrawal history and other information regarding his DraftKings

Coblentz
Patch Duffy
& Bass LLP

The Hon. Natasha C. Merle, USDJ
October 21, 2024
Page 3

account; communications between Plaintiff and his three DraftKings hosts; and internal communications regarding Plaintiff's account, to the extent not privileged, possessed by the six DraftKings custodians.  Plaintiff's view – that there should be more documents discussing him or his account – is based on unfounded speculation.  Simply put, there are few internal communications about Plaintiff because his allegations of a grand conspiracy against him by DraftKings employees is not borne out by the record.

In sum, DraftKings complied with its obligations in response to the August 12 Order. It should not be compelled to do anything more.

***Amendment of Complaint:*** Plaintiff also seeks a conference to discuss his interest in amending his complaint to assert a claim for fraud.[2]  That request should be denied for two reasons.  First, any decision as to whether Plaintiff should be given leave to amend—and he should not—should be made part of, and not before, a decision on DraftKings' pending motion to dismiss.

Second, Plaintiff's proposed amendments, including his purported fraud claim, are futile.  His new fraud claim in particular is preposterous.  Plaintiff complains that, earlier this year, DraftKings offered him a set of free tickets to a baseball game and then rescinded that offer.  *See* Ex. A (Plaintiff's Oct. 7, 2024 Proposed Amended Complaint).  Among other things, Plaintiff does not allege that he provided anything of value in exchange for the tickets he never received, or that DraftKings misrepresented anything to deprive him of something valuable.  Instead, Plaintiff appears to claim that, had he known that DraftKings employees allegedly communicated internally that he was difficult and divisive, he would have stopped gambling on the platform.  This is wholly speculative.  Nor could he have reasonably relied on either the promise of the tickets (since he did not receive them), or his apparent assumption that DraftKings employees liked him, in continuing to participate on the platform.[3]  Not only is this claim *completely unrelated* to Plaintiff's allegations of account tampering, he fails to adequately allege any element of fraud.

For the foregoing reasons, Plaintiff's request for a conference should be denied.


Very truly yours,
*/s/ Rees F. Morgan*

---

[2] Plaintiff also seeks to amend his complaint to include assertions made in his Affidavit in support of his Opposition to DraftKings' Motion to Dismiss (ECF No. 33-5). But as discussed in DraftKings' Reply in support of its Motion to Dismiss, the assertions in Plaintiff's affidavit—even if included in the pleadings—do not salvage any of Plaintiff's claims. *See* ECF No. 33-6 n.4.

[3] Additionally, while his proposed amendment omits this fact, DraftKings provided Plaintiff with tickets to a different baseball game after rescinding the tickets at issue.

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Steven Jacobs, | |
| Plaintiff, | Case No. 1:24-cv-03077-NCM-VMS |
| - against - | |
| DraftKings Inc., | ~~FIRST~~ SECOND **AMENDED COMPLAINT** |
| Defendant. | |

Plaintiff Steven Jacobs ("Plaintiff") submits this Second Amended Complaint against defendant DraftKings Inc. ("Draftkings"), and alleges upon personal knowledge and upon information and belief as follows:

**INTRODUCTION**

1.      On March 30, 2023, Plaintiff left his apartment in Long Island City, New York to go to his office in Manhattan.  In the short walk between his apartment and the subway platform a masked man grabbed him, violently spun him around, and threatened to kill him if he did not pay half a million dollars to an individual named Gadoon "Spanky" Kyrollos (hereinafter referred to as "Spanky").

2.      Spanky and the masked man did not act alone.  Defendant DraftKings knowingly provided Plaintiff's address, as well as Plaintiff's sensitive personal information, financial history, and betting history that caused Spanky to act.  DraftKings loaded the proverbial gun, and put it in Spanky's hand.

3.      Plaintiff's life was never the same.

4.      This is a case about DraftKings—one of the biggest and most profitable sports

1

betting companies in the world—knowingly and willfully aiding and abetting a violent assault, battery, and death threat, (and later, a significant computer hack), all while defrauding its customer with lie after lie.

5.       DraftKings' customers, including Plaintiff, rely on DraftKings' sheen of legitimacy as a licensed sportsbook that is omnipresent in television advertisements to trust DraftKings implicitly with their private personal and sensitive financial information.  Plaintiff would have never dreamed that DraftKings would willfully conspire with a dangerous man with an ax to grind, intent on doing Plaintiff harm.

6.       Yet over the course of the last year2023, the upper echelon of DraftKings has donedid exactly that.  It has worked with Spanky to severely harass and endanger Plaintiff.

7.       To further terrorize Plaintiff, DraftKings has systematically covered up its bad acts by lying to Plaintiff for over a year (telling both big lies and small lies) while ,refusing to provide any information to Plaintiff regarding the multiple dangerous incidents in which DraftKings has played a significant part.

8.       Enough is enough, Plaintiff brings this action to put a stop to DraftKings' campaign of harassment and to recover for the loss of his career that was caused by DraftKings, as well as the physical, mental and severe emotional damages he has sustained, as well asand to seek punitive damages for DraftKings' malicious, willful and wanton behavior.

## THE PARTIES

9.       Plaintiff is an individual residing in Queens County, New York.

10.      Defendant DraftKings is a digital sports gambling company, in the business of taking sports bets, incorporated in Delaware and with a principal place of business located at 222 Berkley St., Boston, Massachusetts 02116.

## JURISDICTION AND VENUE

11.     This Court has subject matter and personal jurisdiction over this action pursuant to CPLR §§ 301 and 302.

12.     DraftKings committed the tortious acts set forth below within the state of New York, and caused injury to Defendant in New York while regularly doing and soliciting business in New York (including being licensed in New York) and acting as one of the largest sportsbooks in New York, including in Queens County, since its sports betting operations began in January 2022.

13.     DraftKings also regularly does business and solicits business in New York and derives substantial revenue from its business in New York.

14.     In addition, DraftKings should have expected its conduct to have consequences in New York and it derives substantial revenue from interstate commerce.

15.     Venue is proper in this Court pursuant to CPLR § 503(a) because Queens County is the county in which Plaintiff resides, and the county in which a substantial part of the events giving rise to the claims occurred.

## FACTUAL BACKGROUND

### A.  Plaintiff's Initial Relationship with DraftKings Sportsbook.

16.     In January 2022 legislation came into effect that legalized mobile sports betting in New York for certain licensed providers.  One such provider was DraftKings, which is one of the largest sports betting operators (i.e. legalized bookies) in the world.

17.     In or around January 2022, a VIP host at DraftKings, Joe Di Chiaro ("Di Chiaro") contacted Plaintiff in order to recruit him to play on DraftKings in light of the recent legalization

of mobile sports gambling in New York.  Di Chiaro induced Plaintiff to play substantial volume on DraftKings by offering bonuses and other VIP perks.

18.    As part of the customer relationship, DraftKings gained and retained access to Plaintiff's trust, as well as his personal information, banking history, and financial data.  Plaintiff trusted DraftKings implicitly, and his relationship with Di Chiaro became akin to a friendship (or so Jacobs was led to believe).

19.    Plaintiff placed bets as a VIP customer of DraftKings for over a year.  During that time Plaintiff and Di Chiaro were in regular touch, and had developed a relationship of trust (or, at least, Plaintiff believed they had at the time).  Di Chiaro acted as Plaintiff's sole point of contact with DraftKings, and regularly interacted with Plaintiff on the phone and in person at various DraftKings VIP events such as basketball and hockey games in DraftKings' suite at Madison Square Garden in New York, New York.

**B. Plaintiff Informs DraftKings That An Extortionist Claimed To Have Access To The Upper Echelon Of DraftKings And Plaintiff Specifically Requests That DraftKings Protect Plaintiff's Private Information.**

20.    In or around February 2023, Spanky, a prominent sports gambler with nearly fifty thousand followers on social media site X (under the name @spanky), began extorting Plaintiff for hundreds of thousands of dollars, despite the fact that Plaintiff had never met Spanky, never spoken to Spanky (until the extortion plot began), and had no relationship with Spanky whatsoever (business or otherwise).

21.    Spanky is extraordinarily influential in the sports gambling ecosystem.  For example, Spanky founded, hosts, and runs an annual sports betting conference called "BetBash" every year at Circa Resort and Casino in Las Vegas, NV, with hundreds of attendees.

22.    Spanky's massive influence in the sports gambling universe makes it profitable for DraftKings to maintain a close relationship with him (including by entering the partnership

with Spanky's BetBash discussed below).  Access to Spanky's contacts and information are enormously valuable for DraftKings.

23.    In 2022, DraftKings apparently entered a partnership with Spanky and BetBash, with DraftKings' CEO Jason Robins personally being in touch with Spanky and sending a team of employees, including a senior bookmaker named Johnny Avello, to speak at BetBash.  Robins, Avello, DraftKings and Spanky maintained their close relationship, with Avello attending BetBash the following year in August 2023.

20.24.  Spanky claimed that Plaintiff owed him hundreds of thousands of dollars despite the fact that Plaintiff and Spanky had never met, and had spoken on the phone only twice.

25.    Notwithstanding Spanky's online popularity, he has a history of using "threats, intimidation, and even physical force to collect debts."

21.26.  According to FBI archives available online, Spanky has previously been arrested in connection with the use of such "threats, intimidation, and even [] physical force to collect debts." *See* https://archives.fbi.gov/archives/newyork/press-releases/2012/twenty-five-individuals-indicted-in-multi-million-dollar-illegal-nationwide-sports-betting-ring;*see also* https://www.npr.org/transcripts/508588660 ("[O]n the wiretap, McNally could hear Spanky calling up a guy connected to the mob. Spanky wanted to send in some muscle to try to get his money back.").

22.27.  Spanky apparently believed that he was entitled to any funds held in Plaintiff's DraftKings account, and it was clear Spanky would go to any lengths to try to force Plaintiff to pay.

23.28.  On or around February 28, 2023, Spanky informed threatened Plaintiff by saying that he would be attending a conference in Boston, MA, the next week, at which his close contacts Spanky had acquaintances in the "upper echelon" of DraftKings, and that he was going to attend a conference in Boston, MA at which where DraftKings would provide him with Plaintiff's private personal information, address, and financial and betting history. any and all

information he requested regarding Plaintiff's account.

24.    Spanky explained ominously that "[t]his is a request [he] can only make in person,"
presumably because it is so patently improper for DraftKings to provide Spanky with Plaintiff's
private personal and sensitive financial information.

25.29.  In the same conversation, Spanky indicated he had dangerous associates, and that
defying Spanky would significantly endanger Plaintiff.

26.30.  The 2023 MIT Sloan Sports Analytics Conference (the "Sloan Conference")—a
major annual sports analytics conference which is attended regularly by Spanky—took place on
March 3-4 in Boston, MA.  DraftKings sponsored the Sloan Conference, and DraftKings' CEO
Jason Robins attended and spoke at the conference.

27.31.  In or around early March 2023 (prior to the Sloan Conference), Plaintiff promptly
reported the contents of his discussion with Spanky to Di Chiaro, who Plaintiff fully trusted at the
time.  In particular, Plaintiff reported that Spanky (i) was a very dangerous individual; (ii) had
claimed to be connected all the way up to the "upper echelon" of Draftkings; (iii) had claimed
that he was going to attend a conference in Boston at which DraftKings would provide him with
Plaintiff's private personal and sensitive financial information, including Plaintiff's address, as
well as his financial, banking, and betting history; and (iv) that he intended to use information
that he received from DraftKings to extort Plaintiff, threaten Plaintiff, and/or potentially injure or
kill Plaintiff.

28.32.  In sum, Plaintiff told Di Chiaro in extremely plain terms that if Plaintiff's private
information was not protected by DraftKings, then Plaintiff would be in extreme danger.

29.33.  At the time, Di Chiaro seemed shocked that Spanky claimed to have such access to
DraftKings' data (which it was required by law to ensure privacy over).  Di Chiaro understood
appeared to understand that divulging such information to Spanky would be extraordinarily

improper, and could cause a major problem for the company. As a result, Di Chiaro said that he would do everything he could to help ensure that nothing was improperly leaked to Spanky or anyone else.

34.    In a subsequent conversation, Di Chiaro said represented that he had put in place enhanced account security on Plaintiff's account, and reassured Plaintiff that in light of this added security Plaintiff's information was completely safe and secure. Di Chiaro said that if *anyone* at DraftKings (including anyone in the "upper echelon") were to try to procure any information with respect to Plaintiff's account, Di Chiaro would be able to see it and put a stop to it.

30.35.  Notably, despite the fact that Di Chiaro knew or should have known about the DraftKings-sponsored Sloan Conference, Di Chiaro did not inform Plaintiff that CEO Robins and a contingent from DraftKings would be attending the conference just days later (along with Spanky).

**C.    DraftKings Divulges Plaintiff's Private Information To Spanky, Leading To Death Threat, Assault And Battery.**

36.    The supposed security measures that Di Chiaro claimed to have put into place did not work failed to prevent DraftKings' misconduct (if, indeed, he put any security measures in place at all).

31.37.  At the Sloan Conference, Spanky's upper-echelon DraftKings contacts provided him with Plaintiff's financial information, banking history, betting history, address and other personal information, as well as the contents of Plaintiff's private discussions with Di Chiaro. This information spurred Spanky to send an attacker to Plaintiff's home (as set forth below).

38.    Indeed, iIn late-March 2023, Plaintiff was contacted by Spanky's associate Oscar Jones ("Jones"). Jones made it abundantly clear to Plaintiff in emails and text messages that he and Spanky had received Plaintiff's personal and financial information from DraftKings

(including the contexts of Plaintiff's private texts with Di Chiaro, which no one outside of DraftKings and Plaintiff could have possibly known).

32.39.  On March 27, 2023, Jacobs—fully believing (incorrectly) that Di Chiaro was still acting in good faith to root out bad actors at DraftKings—informed Di Chiaro that he had confirmed with certainty that information was improperly divulged to Spanky at the conference in Boston, and stated that he hoped Di Chiaro was able to root out who at DraftKings improperly collaborated with Spanky.

33.40.  A few days later, on March 30, 2023, at approximately 8:45 am, Plaintiff left his apartment building in Long Island City, NY, to board the subway to commute to his office in Manhattan.  As Plaintiff was walking down the steps to the subway platform, he heard a man yelling his name, and felt the man grab his arm from behind.  The man twisted Plaintiff's arm and aggressively spun Plaintiff around on the subway platform.  The man was large, muscular, and covered head to toe in dark clothing, including a black mask that covered his entire face and head (except for his eyes).

34.41.  The man identified Spanky and Jones as the people that had sent him and told Plaintiff that he had to pay the money that he "owed."  The man told Plaintiff that "we know where you live, and we know where you work on Lexington Avenue."  The man also said that if Plaintiff did not pay Jones what he claims to be owed, Plaintiff "did not want to know what [the man] would do to [Plaintiff] if [the man] had to come back."

35.42.  Plaintiff understood this to be a death threat (the "Death Threat") and immediately reported the assault, battery, and Death Threat to the New York Police Department as well as other law enforcement agencies.

36.43.  Plaintiff also promptly reported the Death Threat to Di Chiaro at DraftKings. Plaintiff explained that the DraftKings leak led directly to the Death Threat because, upon

information and belief, DraftKings provided Spanky and/or others with Plaintiff's private account information, address, financial history, and betting history, which gave Spanky the means and desire to send "muscle" to make the Death Threat.

37.44.  Di Chiaro's attitude appeared to have changed completely since Plaintiff had first reported the danger from Spanky. Although Di Chiaro spoke sympathetically and acknowledged the security breach at DraftKings, he refused to provide *any information whatsoever* to Plaintiff as to how it happened. Instead, Di Chiaro stonewalled, claiming that DraftKings' investigation regarding the information that it provided to Spanky was a private internal matter (despite knowing that withholding information from Plaintiff could result in injury or death).

38.45.  Di Chiaro made it clear that he would not say a single word to Plaintiff regarding DraftKings' investigation into its role in the Death Threat and the surrounding incidents. Upon information and belief the "upper echelon" of DraftKings ordered Di Chiaro not to provide Plaintiff with any further information regarding DraftKings' wrongful conduct.

39.46.  It is no coincidence that the Death Threat occurred within days of DraftKings' leak to Spanky and Jones. The Death Threat could not have and would not have happened but for the knowing assistance of the "upper echelon" of DraftKings.

40.47.  After the Death Threat, Plaintiff's life has not been the same:

a) Plaintiff has lived in a state of constant fear, including in his own home;

b) Plaintiff can no longer enjoy life in New York without being extremely conscious of his surroundings and in fear for his safety. For example, on the advice of law enforcement, Plaintiff:

    i.   Does not go outside alone at night or in sparsely populated areas;

    ii.  Uses alternate entrances and exits at home and at work, and varies his schedule to thwart anyone potentially lying in wait; and

    iii. Must be constantly vigilant of surroundings, living at all times as if any

moment in public could provide an opening for Plaintiff to be attacked, injured or killed.

c)   Plaintiff engaged counsel (at significant expense) with experience dealing with violent extortionists;

d)   Plaintiff suffered and is still suffering severe emotional distress which, among other things, has caused him to discuss the Death Threat mental health professionals;

e)   Plaintiff has trouble sleeping, and is terrified whenever there is a knock on the door or a phone ringing;

f)   Plaintiff has been hindered in his work at an international law firm due to his constant (reasonable) fear for his own safety as well as the safety of his partner and dog who share his apartment.

g)   In sum, Plaintiff has been completely deprived of the ability to enjoy life in public (and, to some degree, in private as well).

~~41.~~48.  Plaintiff subsequently learned that his apartment building was in possession of a security video of the Death Threat (which video was collected by law enforcement), which shows that the masked man who made the Death Threat waited outside his apartment for approximately *three hours* starting in the early morning on March 30, 2023, waiting for Plaintiff to emerge to head for work.

~~42.~~49.  The fact that the perpetrator of the Death Threat would lie in wait for so long ~~terrifies Plaintiff~~is terrifying.

**D.   DraftKings Defrauds Plaintiff, Assists Hacker And Engages In Cover-up.**

50.      ~~Notwithstanding Di Chiaro's (nonspecific) reassurances that DraftKings was investigating and addressing the supposedly inadvertent information leak~~After the Death Threat, DraftKings' ~~wrongful conduct and~~ dangerous collaboration with Spanky to harass Plaintiff

continued.  Even worse, DraftKings began a campaign of fraud.

51.    From that point forward, DraftKings lied to Plaintiff in nearly every interaction (including regarding DraftKings' conduct vis-à-vis Spanky).  DraftKings' dishonesty was intentional and malicious—it knew that if it was honest with Plaintiff, he would take his business elsewhere and DraftKings' profits would suffer.

52.    The most egregious example of DraftKings' fraudulent conduct occurred just after the Death Threat.  By way of background, Di Chiaro and DraftKings were aware that Jacobs' significant other was a big fan of the San Francisco Giants, and arranged a VIP experience at a Giants/Yankees game scheduled for April 1, 2023.  The experience included dinner with a former player, field access for batting practice, and VIP tickets to the game.  Di Chiaro knew that Jacobs and his significant other were very excited for this experience.

53.    On March 30, 2023, at approximately 4pm, a DraftKings employee messaged Di Chiaro stating that she would send the tickets to Jacobs "tomorrow."  Di Chiaro asked what would happen if it rains (as there was potential rain in the forecast), and the employee responded that the experience usually won't be cancelled "unless the game is called off."

54.    Later that same day, at approximately 10:20pm Di Chiaro messaged the same DraftKings employee and told her "not to send [Jacobs] tickets for Saturday unless [Di Chiaro] give[s] the go ahead.  Insane situation going on & we may have to pull the tickets."

55.    On March 31, 2023 at approximately 5pm, Di Chiaro called Jacobs and told him, falsely, that the Yankees (not DraftKings) had cancelled the VIP experience due to a threat of rain.  Di Chiaro spent nearly a half hour on this phone call, lying the entire time.  Among other things Di Chiaro claimed (falsely) that he did everything in his power to avoid the cancellation; Di Chiaro claimed (falsely) that the issue was on the Yankees end because they would not hold the event if there was rain in the forecast (even though the rain had not yet come, and would

never end up coming); and Di Chiaro (falsely) acted sympathetic, pretending to empathize with Jacobs due to the fact that this would be a severe disappointment to Jacobs' significant other who had long been promised this experience.

56.    Di Chiaro's March 31, 2023 call was a masterclass in gaslighting.  Jacobs left the call believing that Di Chiaro was acting in good faith and trying to do right by him when, in fact, a decision had been made by DraftKings to not allow Jacobs to be around other DraftKings players (such as at VIP experiences).  On information and belief, this decision was made to avoid Jacobs revealing DraftKings; conduct vis-à-vis Spanky.  Di Chiaro's lies included representing (falsely) that DraftKings was taking the conduct alleged about its complicity with Spanky extremely seriously.  In truth and in fact, DraftKings was not taking it seriously, was laughing about it behind Jacobs' back, and referring to Jacobs (in private) as "ridiculous" or "a jerk."

57.    Several months later, a different VIP host messaged Di Chiaro confirming that the Yankees/Giants experience "was cancelled due to [Jacobs] being ridiculous, not rain right? Lol"

58.    Di Chiaro replied "Correct."

59.    On or before May 16, 2024, a VIP host named Max Bloch ("Bloch") took over responsibility for Jacobs' DraftKings account.  On May 16 Bloch messaged Di Chiaro explaining that Jacobs was asking for tickets to an event at Madison Square Garden, and that Bloch was going to reply by lying and saying that the box was full.

60.    Di Chiaro confirmed that Bloch should lie to Jacobs (again), because, per someone at DraftKings referred to as "Chinski" (likely Michael Rybczynski, DraftKings' Director of Player Development), "want[ed] to avoid [Jacobs] in any spaces with other players."

61.    Bloch proceeded to lie to Jacobs, falsely claiming the box was full, rather than telling him the true reason his request for tickets was denied.

62.    These were not harmless white lies.  They were done with malicious intent to

induce Jacobs to continue as a DraftKings customer, despite the fact that DraftKings had taken quite a bit of money from him in the past.  Di Chiaro, Bloch, and DraftKings knew full well that if DraftKings was truthful about its reason for cancelling the Yankees/Giants experience, and truthful about the fact that it was not taking the Death Threat seriously, then Jacobs would have immediately stopped playing on DraftKings (and realized DraftKings' malicious behavior much sooner than he did).

43.63.  The lies of Di Chiaro, Bloch, and DraftKings were successful in Jacobs continuing to be a customer and allowing DraftKings to continue collecting money from Jacobs while hiding its dangerous collaboration with Spanky.

44.64.  Several months after the Death Threat, on October 2, 2023, Plaintiff woke up in the morning and was unable to access his DraftKings account.  According to the DraftKings software, no account existed under Plaintiff's registered email address.  Plaintiff sought assistance from DraftKings by email and through texts to his VIP hosts Di Chiaro and Taylor O'Brien ("O'Brien"), who had taken over responsibility for Plaintiff's account from Di Chiaro and Bloch.

45.65.  After some time, DraftKings support responded by email saying: "[a]fter a little digging, I was able to locate your account . . . On 10-2-23 at 1:32:39 AM EST, our site received a request to update [i.e. to change] your email address and this was approved"

46.66.  The email failed to provide any further information regarding the supposed request to change Plaintiff's registered email account in the middle of the night, or regarding how such request was possibly "approved."

47.67.  Changing a registered email address on a DraftKings account has significant consequences, as it gives the holder of the new email address access to all of the accounts funds as well as the personal and financial information of the account holder.  For that reason, DraftKings has strict rules that are supposed to be followed in order to change a customer's registered email

address.

48. 68.  In particular, DraftKings' rules require (i) an email from the current registered email address requesting the change and listing the new email address, and (ii) a photo of the customer holding his photo ID to be uploaded to DraftKings' secure document portal.  On October 2, 2023—the day the email change was allegedly requested and inexplicably approved by DraftKings—Plaintiff neither emailed any request to change his registered email address nor uploaded anything at all to DraftKings' secure document portal.

49. 69.  Thus, there are only two possibilities as to how the request to change Plaintiff's registered email address was "approved" by DraftKings.  Either (1) DraftKings intentionally changed the address to assist a bad actor (on information and belief, Spanky); or (2) DraftKings completely neglected to follow its own procedures with respect to changing Plaintiff's registered email.  Given the gigantic consequences of changing a registered email address with a licensed sports gambling provider such as DraftKings, the latter is extremely unlikely (and even if it is the case, DraftKings is nevertheless liable for extraordinary negligence and/or recklessness).

50. 70.  Upon information and belief, DraftKings intentionally assisted a hacker in taking control of Plaintiff's DraftKings account.

51. 71.  Later that day, Plaintiff had a call with O'Brien.  On the call, O'Brien confirmed that the email address registered on Plaintiff's account had, in fact, been changed to a specific MS Outlook email address that included Plaintiff's last name (the "Imposter Email Address").

52. 72.  Plaintiff did not create or control the Imposter Email Address, had never heard of the Imposter Email Address prior to his call with O'Brien, and had no association with the Imposter Email Address.  However, the fact that the Imposter Email Address included Plaintiff's last name demonstrates that this was no random hack—the holder of the Imposter Email Address knew that the relevant DraftKings account belonged specifically to Plaintiff, and also knew Plaintiff's full

name.

~~53.~~73.  Plaintiff asked O'Brien to provide (1) the IP address of the attempted login at 1:32:39 AM EST; and (2) information regarding the request to change Plaintiff's registered email to the Imposter Email Address (including how the request to change Plaintiff's email address was made, and how it was conceivably approved).

~~54.~~74.  O'Brien appeared to understand the seriousness of the situation, and promised he would try to update Plaintiff within hours.

~~55.~~75.  After receiving no response for nearly 24 hours, DraftKings emailed Plaintiff saying that its investigation had concluded and that "all activity has been deemed valid."  Notably, despite declaring "all activity valid," DraftKings' email failed to explain how it is was possible that Plaintiff's registered email was "validly" changed to an email address that he had never heard of, or why that change was approved by DraftKings in direct contravention to its own vital policies.

~~56.~~76.  After Plaintiff's initial call with O'Brien, on information and belief, the "upper echelon" of DraftKings ordered Di Chiaro and O'Brien not to provide any further information to Plaintiff (just as it had done with regard to the Death Threat).  As a result, over the next week bothof Plaintiff's VIP hosts ignored Plaintiff's calls and texts, and refused to provide any information whatsoever.

~~57.~~77.  On October 9, 2023, Plaintiff emailed DraftKings' Chief Legal Officer, Stanton Dodge ("Dodge"), explaining the situation and requesting assistance to get to the bottom of what was happening.  To date, Dodge has not responded.

~~58.~~78.  Plaintiff was stunned that DraftKings would not provide him with relevant information regarding his own account, particularly when DraftKings was well aware of the Death Threat, and well aware of the seriousness attached to turning over Plaintiff's funds and account details to a hostile actor (upon information and belief, Spanky).

59.79.  After ten days of stonewalling and refusing to provide any information regarding the hack and/or how the email address change was approved, on October 11, 2023 Di Chiaro informed Plaintiff that he could request such information by email to DraftKings' privacy department.  Di Chiaro did not provide any explanation as to why it took him *ten days* to simply provide an email address for the (allegedly) relevant department.  Plaintiff requested such information by email the same day.

60.80.  Around the same time Di Chiaro suddenly and without explanation informed Plaintiff that DraftKings was "revok[ing] [his] VIP status, inclusive of all VIP perks, bonuses & benefits . . . ."  Plaintiff had spent hundreds of thousands of dollars earning his status on DraftKings, largely as a result of representations from Di Chiaro regarding such significant bonuses and VIP treatment.  Such representations were apparently entirely false.

61.81.  On information and belief, DraftKings revoked Plaintiff's VIP status so he would no longer have access to discussions with VIP hosts, as it became clear to DraftKings that Plaintiff would not rest until he was provided with the information that he needed to ensure his own safety (and which DraftKings plainly did not want to provide).

62.82.  DraftKings' Privacy Department did not respond for *over a month*.

63.83.  Throughout that month and at all relevant times since the Death Threat, Plaintiff has lived in constant fear for his safety. That fear has significantly worsened due to the fact that DraftKings was and is clearly still working with Spanky (and/or other bad actors) against Plaintiff.

64.84.  On November 13, 2023 DraftKings' Privacy Department sent Plaintiff six files that were supposedly responsive to Plaintiff's information requests.  However, in sum and substance these files are nothing more than indecipherable spreadsheets that do not answer any of the key questions regarding the hack.

65.85.  After reviewing the files, on November 14, 2023, Plaintiff responded "[t]hanks, but this is totally non-responsive.  Please reread my initial email about [DrafKings] granting

16

unauthorized access to my account to [the Imposter Email Address].  In particular I need . . . information regarding how and why the request to change my registered email to the [Imposter Email Address] was granted, when I provided no documentation or authorization to do so."

66.86.  On November 16, 2023 DraftKings responded by saying in relevant part "[w]e are not able to provide any information regarding internal policies or investigations at this time."

67.87.  On November 17, 2023 Plaintiff pleaded with DraftKings to reconsider, explaining that the Imposter Email Address was plainly set up by dangerous people in order to to steal Plaintiff's identity.  DraftKings never responded or provided any additional information.

68.88.  Upon information and belief, the upper echelon of DraftKings assisted Spanky (or someone working with Spanky) to hack Plaintiff's DraftKings account on October 2, 2023 (just as DraftKings aided and abetted Spanky and his masked thug in making the Death Threat on March 30, 2023).

69.89.  Upon information and belief, the upper echelon of DraftKings engaged in a systematic cover-up regarding both incidents.  Among other things, the cover-up was designed to gaslight Plaintiff by falsely claiming that "all activity was valid" and cause further distress.

90.    Upon information and belief, any and all of DraftKings' employees that divulged information to Spanky, Jones and/or others, or that aided and abetted the Death Threat and the hack against Plaintiff in any way, were acting within the scope of their employment at DraftKings.  Indeed, as set forth above, it is extraordinarily profitable for DraftKings to maintain a close relationship with Spanky to benefit from his contacts, information, and influence.

70.91.  The involvement of the upper echelon of DraftKings in the conduct discussed above—including, on information and belief, CEO Robins, Avello, and their respective teams— further demonstrates that DraftKings induced or otherwise approved of aiding and abetting Spanky.

71.92.  Upon information and belief, DraftKings knowingly and willfully collaborated with

17

Spanky and his associates in a year-long deliberate and malicious campaign of harassment and intimidation against Plaintiff, as set forth above.

93.     The campaign of harassment against Plaintiff has worked, as Plaintiff has been terrified for his safety ever since the Death Threat.

94.     On June 26, 2024, as a direct and proximate result of DraftKings' conduct alleged herein and public statements from DraftKings that (falsely) branded Jacobs a liar, Jacobs was forced to leave his job as a New York lawyer at which he earned over $500,000 per year.

72.95.  Since that date, despite extensive efforts and as a direct result of DraftKings' misconduct, lies, and extensive influence, Jacobs has been unable to procure employment in New York, and it appears his career as a New York lawyer is over.

**FIRST CAUSE OF ACTION**
**(Aiding and Abetting Assault)**

73.96.  Plaintiff repeats the allegations contained in the preceding paragraphs as though set forth in full herein.

74.97.  The Death Threat described above constituted an assault against Plaintiff and caused severe injury to Plaintiff.

75.98.  Prior to the Death Threat, as a result of Plaintiff's discussions with Di Chiaro set forth above, DraftKings knew that Spanky was a dangerous individual who intended to use any of Plaintiff's private information that Spanky received from DraftKings to extort, injure, and/or kill Plaintiff.

76.99.  DraftKings nevertheless divulged Plaintiff's private personal and financial information to Spanky, including Plaintiff's address where the Death Threat ultimately took place, financial history, and betting history, despite knowing that Spanky intended to use it to extort, injure, and/or kill Plaintiff.

77.100. The Death Threat would not have occurred but for the substantial and knowing

assistance provided by DraftKings.  Indeed, DraftKings divulged to Spanky and Jones information that provided both the means to extort, injure and/or kill Plaintiff, as well as the desire to do the same.

78.101.As a direct result of the foregoing, Plaintiff lost his job, and sustained physical, emotional, and psychological injuries, along with pain and suffering.

79.102.DraftKings' conduct toward Plaintiff was so malicious, willful and wanton and/or involved a reckless or conscious disregard of the health and safety of Plaintiff, so as to give rise to punitive damages.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Battery)

80.103.Plaintiff repeats the allegations contained in the preceding paragraphs as though set forth in full herein.

81.104.The Death Threat described above constituted a battery against Plaintiff and caused severe injury to Plaintiff.

82.105.Prior to the Death Threat, as a result of Plaintiff's discussions with Di Chiaro set forth above, DraftKings knew that Spanky was a dangerous individual who intended to use any of Plaintiff's private information that Spanky received from DraftKings to extort, injure, and/or kill Plaintiff.

83.106.DraftKings nevertheless divulged Plaintiff's private personal and financial information to Spanky, including Plaintiff's address where the Death Threat ultimately took place, financial history, and betting history, despite knowing that Spanky intended to use it to extort, injure, and/or kill Plaintiff.

84.107.The Death Threat would not have occurred but for the substantial and knowing assistance provided by DraftKings.  Indeed, DraftKings divulged to Spanky and Jones information that provided both the means to extort, injure and/or kill Plaintiff, as well as the desire to do the

same.

85. 108. As a direct result of the foregoing, Plaintiff lost his job, and sustained physical, emotional, and psychological injuries, along with pain and suffering.

86. 109. DraftKings' conduct toward Plaintiff was so malicious, willful and wanton and/or involved a reckless or conscious disregard of the health and safety of Plaintiff, so as to give rise to punitive damages.

**THIRD CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**

87. 110. Plaintiff repeats the allegations contained in the preceding paragraphs as though set forth in full herein.

88. 111. Plaintiff trusted DraftKings with his money and personal data, relying on DraftKings' reputation and promises regarding security. Plaintiff would have never dreamed that DraftKings would purposefully endanger Plaintiff.

89. 112. As a result of Plaintiff's discussions with Di Chiaro set forth above, DraftKings knew that Spanky was a dangerous individual who intended to use any information that he received from DraftKings to extort, injure, and/or kill Plaintiff.

90. 113. DraftKings nevertheless divulged Plaintiff's private personal and financial information to Spanky, including Plaintiff's address where the Death Threat ultimately took place, and financial history, despite knowing that Spanky intended to use it to extort, injure, and/or kill Plaintiff.

91. 114. DraftKings' betrayal of Plaintiff's trust as well as its conduct as described above—namely working with Spanky and others to systematically harm and terrorize Plaintiff over the course of a full year—is extreme and outrageous, exceeds all bounds of decency and is utterly intolerable in a civilized society.

92. 115. Indeed, DraftKings divulged to Spanky and Jones information that provided both

20

the means to extort, injure and/or kill Plaintiff, as well as the desire to do the same.

93.116. Moreover, even after being made aware of the Death Threat, DraftKings continued to work with Spanky to endanger Plaintiff, including by changing Plaintiff's registered DraftKings email address, putting at risk all of Plaintiff's funds, financial history, banking history, and personal information.

94.117. In engaging in the conduct set forth above, DraftKings intended to cause Plaintiff severe emotional distress or consciously disregarded a substantial probability of causing Plaintiff severe emotional distress.

95.118. The cover-up DraftKings engaged in regarding the Death Threat and the hack caused further severe distress. As a result of the cover-up, DraftKings' conduct that caused Plaintiff severe emotional distress is ongoing.

96.119. As a direct and proximate result of the foregoing, Plaintiff lost his job, and sustained additional severe emotional distress and psychological injuries, along with pain and suffering.

97.120. DraftKings' conduct toward Plaintiff was so malicious, willful and wanton and/or involved a reckless or conscious disregard of the health and safety of Plaintiff, so as to give rise to punitive damages.

## FOURTH CAUSE OF ACTION
**(Negligence, Negligent Supervision and Retention, Negligent Infliction of Emotional Distress)**

98.121. Plaintiff repeats the allegations contained in the preceding paragraphs as though set forth in full herein.

99.122. As set forth above, upon information and belief any and all of DraftKings' employees that divulged information to Spanky or his henchman Jones, or that worked with Spanky and Jones to cause the Death Threat and the hack against Plaintiff, were acting

intentionally and within the scope of their employment at DraftKings.

100.123.    However, to the extent DraftKings argues that any of its employees' conduct vis-à- vis Plaintiff was beyond the scope of their employment, DraftKings is nevertheless alternatively liable under theories of negligence, including negligent hiring, training, supervision, and retention.

101.124.    As a result of Plaintiff's discussions with Di Chiaro prior to the Death Threat, DraftKings knew or reasonably should have known that its "upper echelon" was intending to and had a propensity to improperly divulge Plaintiff's private account information (including his address, banking history, financial history, betting history and even his texting history with Di Chiaro) to Spanky and/or other hostile actors.

102.125.    As a result of Plaintiff's discussions with Di Chiaro prior to the Death Threat DraftKings knew or reasonably should have known that divulging Plaintiff's private account information (including his address, banking history, financial history, betting history and texting history with Di Chiaro) to Spanky and/or other hostile actors would put Plaintiff in danger of severe injury and/or death.

103.126.    After the Death Threat and DraftKings' internal coverup of its participation in the Death Threat, and despite full knowledge regarding the Death Threat, DraftKings nonetheless continued to employ people—including in its upper echelon—who had the propensity to provide private information to Spanky and/or other hostile actors, including full access to Plaintiff's account in connection with the October 2, 2023 hack.

104.127.    DraftKings had a duty of care to properly hire, train, retain, supervise and discipline their employees to avoid unreasonable harm to others and to take steps to alleviate harm caused by one's affirmative conduct. In particular, DraftKings had a duty of care to properly hire, train, retain, supervise and discipline their employees to ensure that employees

would *never* (i) assist with an assault, battery and death threat or (ii) improperly change the registered email address on an account without following proper procedures, thereby allowing the holder of the imposter email to access all funds and account information.

~~105.~~128.    DraftKings breached its duty of care by way of its own conduct alleged herein, including but not limited to failing to terminate anyone and everyone, including the "upper echelon" of DraftKings that committed the conduct referenced herein, or to take steps to warn Plaintiff and anyone else with a DraftKings account of the substantial and unacceptable risks of providing information and money to DraftKings (i.e. that DraftKings will work with dangerous bad actors who are intent on doing customers harm).

~~106.~~129.    As a direct result of the foregoing, Plaintiff lost his job, and sustained physical, emotional, and psychological injuries, including significant and reasonable fear for his own safety, along with pain and suffering.

130.    DraftKings' conduct toward Plaintiff was so malicious, willful and wanton and/or involved a reckless or conscious disregard of the health and safety of Plaintiff, so as to give rise to punitive damages.

### FIFTH CAUSE OF ACTION
### (Fraud)

~~107.~~131.    Plaintiff repeats the allegations contained in the preceding paragraphs as though set forth in full herein.

132.    DraftKings made multiple material misrepresentations of fact to Plaintiff, including, most significantly, on March 31, 2023 by having Di Chiaro falsely tell Plaintiff that the promised Yankees/Giants VIP experience was cancelled by the Yankees (not DraftKings) and due to potential rain in the forecast (as opposed to the true reason, that DraftKings did not want Jacobs around other players because it did not want its conduct vis-à-vis Spanky to be publicized).

133.   Di Chiaro's feigned sympathy and claims that he did everything he could to avoid the cancellation were all part of DraftKings' elaborate and material campaign of misrepresentation.

134.   DraftKings knew its misrepresentations were false at the time Di Chiaro made them.  DraftKings knew the Yankees had not cancelled the VIP experience due to rain.  In fact, DraftKings knew that the Yankees had not cancelled the VIP experience at all.

135.   DraftKings made this misrepresentation with intent to induce reliance from Jacobs that DraftKings was still operating in good faith with respect to Jacobs and still intended to treat him with respect as a VIP customer.  DraftKings knew that if it was honest regarding its reasons for cancelling the VIP experience (including that it was not taking its misconduct surrounding Spanky seriously, and that it wanted to hide its misconduct), then Jacobs would not continue to be a customer of DraftKings.

136.   Jacobs did, in fact, justifiably rely on DraftKings' lies.  Jacobs had no reason whatsoever to believe that Di Chiaro—who he viewed as akin to a friend—was actually deceitful and duplicitous and lied to him at every opportunity, feigned friendship, and then called him "ridiculous" and a "jerk" behind his back.  Jacobs trusted Di Chiaro implicitly, and trusted that he was being honest that the VIP experience was cancelled due to a threat of rain (and not related to DraftKings' misconduct surrounding Spanky). As a result of Jacobs' justifiable reliance, he continued playing on DraftKings for many months until its duplicity fully came to light.

137.   As a direct result of DraftKings' and Di Chiaro's lies, Jacobs was severely damaged by continuing to spend money on DraftKings.  While DraftKings has records of the precise amount that Jacobs was damaged after Di Chairo's March 31, 2023 misrepresentation (which date commenced its campaign of fraud), the total amount of damages sustained by Jacobs by remaining a customer of DraftKings after March 31, 2023 is believed to be in excess of

$150,000.

~~108.~~138.    DraftKings' conduct toward Plaintiff was so malicious, willful, morally republic and wanton, so as to give rise to punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment in his favor and against Plaintiff as follows:

a)  A judgment finding DraftKings liable to Plaintiff as set forth above;

b)  A judgment awarding Plaintiff compensatory damages in an amount to be proven at trial but no less than $5~~1~~ million;

c)  A judgment imposing an award of punitive damages against DraftKings and in favor of Plaintiff in an amount to be proven at trial in connection with each Count for which DraftKings is liable;

d)  Pre- and post-judgment interest;

e)  Reasonable attorneys' fees, costs, and disbursements;

f)  Such other and further relief in Plaintiff's favor as this Court deems necessary, just and proper.

Dated: ~~July~~ October 9~~5~~, 2024
Long Island City, New York

*Steven Jacobs*

By _____
Steven B. Jacobs
*Pro Se*
28-40 Jackson Ave. #26E
Long Island City, NY 11101
(610) 608-3304
stevenbjacobs@gmail.com