Coblentz
Patch Duffy
& Bass LLP

One Montgomery Street, Suite 3000
San Francisco, CA 94104-5500

T 415 391 4800

coblentzlaw.com

Rees F. Morgan
D (415) 772-5754
rmorgan@coblentzlaw.com

December 5, 2024

VIA ECF FILING

The Hon. Vera M. Scanlon
United States District Court
Eastern District of New York
225 Cadman Plaza East,
1214 South Brooklyn, NY 11201
Courtroom 13A–South Wing

Re:    _Steven Jacobs v. DraftKings Inc._; Case No. 1:24-cv-03077-NCM-VMS

Dear Judge Scanlon:

Pursuant to the Court's Order dated November 7, 2024 and this Court's Individual Practice Rule III(b), the parties to the above-captioned action submit this joint letter informing the Court of the current outstanding discovery disputes. Since the November 7 conference with the Court, the parties have conferred on November 13, November 20, and December 2. The Parties have reached an impasse on only one discovery issue, which relates to whether DraftKings must obtain records from two additional custodians. Each party's position is set forth below.

Plaintiff's Position

On November 7, the Court ordered that the parties complete the meet-and-confer process by today's date and submit this joint letter identifying any remaining disputes for the Court. Due to defendant DraftKings' dilatory conduct, and despite my best efforts, such disputes cannot all be fully identified and presented to the Court at this time. As set forth below, only one dispute— whether DraftKings is obligated to run limited search terms across the documents of certain "upper echelon" custodians," is ripe for adjudication at this time.

By way of background, in nearly all of the parties' correspondence since the November 7 Court conference, I have emphasized to DraftKings that it should certify completion of its document production and provide a privilege log no later than November 27, 2024. This would allow sufficient time for processing and review, so that we could properly meet the Court's December 5, 2024 deadline. The privilege log is of particular importance because, as revealed in the parties' calls on November 13 and 20, DraftKings apparently intends to make an extremely questionable blanket assertion of privilege across huge swaths of highly relevant documents. However, it took DraftKings almost _a full month_ to produce only twenty-five (25) documents (many of which are heavily redacted). These documents were produced

Coblentz
Patch Duffy
& Bass LLP

The Hon. Vera M. Scanlon
December 5, 2024
Page 2

December 3 and 4, right on the eve of the due date of this letter.  DraftKings (i) has not certified completion of its production (even subject to the custodian dispute discussed below); (ii) has not provided a privilege log; and (iii) has not provided necessary information to allow me to read and understand certain technical documents it has produced.

As for the sole issue ripe for adjudication—whether DraftKings should be compelled to run the narrow set of agreed-upon search terms (all of which are permutations of my name, email, and other identifying information) across the documents of CEO Jason Robins ("Robins"), Sportsbook Director Johnny Avello ("Avello"), and their respective teams—I respectfully submit that DraftKings' position is completely without merit in law.

As set forth in my opposition to DraftKings' motion to dismiss, On February 28, 2023, my assailant, Gadoon "Spanky" Kyrollos, had informed me that he would be improperly procuring my personal and financial information from the "upper echelon" of DraftKings at an upcoming conference in Boston.  On March 3-4, 2023, Spanky convened at the DraftKings-sponsored MIT Sloan Sports Analytics Conference (the "Sloan Conference") in Boston along with Robins, Avello and their respective team members.  At or around this conference, DraftKings provided Spanky with information that directly led to him sending a masked man to assault and threaten to kill me outside my home several weeks later. It is extremely likely that Robins, Avello, and/or one or more of their team members are the individual(s) who directly assisted Spanky in his assault and battery.

Indeed, Spanky has close personal relationships with both Robins and Avello.  For example, several months after the Sloan Conference Spanky tweeted that Robins "was kind enough to have Johnny Avello and his staff show up at [Spanky's conference] BetBash." (*See* ECF No. 33-5.)  Spanky founded and hosts BetBash, and is involved in every aspect of the conference. If Avello and his team were at BetBash, a close personal relationship with Spanky is certain. CEO Robins, for his part, not only personally sent a DraftKings team to BetBash, but Spanky confirmed on a recent podcast that he has a personal relationship with Robins and that written communications exist between them.  For all of the reasons set forth above, it is not only plausible, but likely, that Robins, Avello, and their respective teams that attended BetBash and the Sloan Conference are in possession of highly relevant responsive documents.  Yet DraftKings is refusing to even run a simple search across these custodians.

In this case about the "upper echelon" of DraftKings, it should not be permitted to avoid producing any documents from its upper echelon.

DraftKings has no legal justification whatsoever for its position.  In its letter to the Court dated October 21, 2024, and in subsequent meet-and-confers between the parties, DraftKings took the position that Robins and Avello are "apex custodians" and thus somehow immune from search.  In Support, DraftKings cited a totally inapposite decision from *In re Mortgate*, 2013 U.S. Dist. LEXIS 129989 (S.D.N.Y. Sept. 11, 2013) in which the partes had agreed upon "over 30,000 search term combinations, a list spanning 1600 pages." *Id*. at *6 (emphasis added).

Coblentz
Patch Duffy
& Bass LLP

The Hon. Vera M. Scanlon
December 5, 2024
Page 3

Here, by stark contrast, DraftKings only needs to search for a small handful of search terms related to Plaintiff's name, username, and email addresses.  Simply put, there is hardly any additional cost for DraftKings to search this small list of terms for relevant documents across the necessary people, and running such searches is plainly required by the Federal Rules.  Indeed, in DraftKings' previous letter it did not even attempt to argue (as required by the Federal Rules to avoid discovery obligations) that searching for such documents would be cumulative, that Plaintiff already had ample opportunity to obtain the information, or that running such searches would be somehow disproportionate to the needs of the case.  See *id.* at *6.  Perhaps this is because DraftKings cannot conceivably claim that such searches would result in a disproportionate volume of documents to review because, to date, it has apparently refused to run the searches at all.

Moreover, as I explained to DraftKings in subsequent correspondence (and for many of the reasons discussed above), the law is clear that the apex doctrine is applied "to protect executives from the expense of *only a deposition*."  *Rosinbaum v. Flowers Foods*, 238 F. Supp. 3d 738 (E.D.N.C. Mar. 1, 2017) (emphasis added).  Indeed, a search of ("apex /s custodian!") yields zero cases in the Second Circuit, and the law in this circuit makes clear that senior executives should not receive any special treatment with respect to having their documents searched.  *Sanders v. Suny Downstate Med. Ctr.*, 2024 U.S. Dist. LEXIS 166658, at *9 (E.D.N.Y. Sept. 16, 2024) (expressly distinguishing *Mortgate* as a case with "vastly more custodians" and ordering that a senior executive be included as a custodian where there, like here, there are limited and narrow search terms).  Thus, even assuming *arguendo* that the "apex" doctrine could shield Robins and Avello from being deposed (which it should not, given their unique personal involvement in the facts alleged), the doctrine has no applicability whatsoever here.

DraftKings, perhaps recognizing that its "apex custodian" argument was meritless, has since pivoted to claiming that Robins, Avello and teams are not likely to have non-cumulative responsive documents.  This is untrue for all of the reasons discussed above.  In any event, since there is virtually no cost for DraftKings to run the searches to see whether these individuals do have responsive documents, their argument that they should be insulated from running such searches has no basis under the Federal Rules.

In light of the foregoing, I respectfully request that the Court order DraftKings (i) to review and produce responsive non-privileged documents in the possession, custody or control of Robins, Avello, and their respective teams that attended the 2023 Sloan Conference and/or BetBash; (ii) to certify completion of its document production by a date certain; and (iii) to provide a privilege log by that same date certain.  This would permit the parties to efficiently brief any remaining issues regarding non-production and/or DraftKings' improper invocation of privilege.

**DraftKings' Position:**

**I.      DraftKings should not be required to search the files of its senior executives.**

Coblentz
Patch Duffy
& Bass LLP

The Hon. Vera M. Scanlon
December 5, 2024
Page 4

Given the limited scope of discovery in this action and the complete lack of evidence suggesting their relevance to this matter, there is no need to search the files of two additional custodians. As the Court ordered on August 12, 2024, Plaintiff is only entitled to limited document discovery related to his account. To that end, DraftKings has already searched 16 custodians who were either responsible for servicing Plaintiff's account or investigating Plaintiff's complaints that his account was allegedly compromised. But despite DraftKings' diligent efforts, Plaintiff now demands that DraftKings include two "apex" custodians: (a) its Chief Executive Officer and Chairman of the Board (Jason Robins) and (b) its Race and Sports Operations Director (Johnny Avello).These custodians do not monitor individual user accounts like Plaintiff's.  None appear in any non-privileged communications produced to Plaintiff. They are unlikely to possess *any* information about Plaintiff's account, much less any unique information not captured by DraftKings' existing searches from sixteen (16) custodians. Plaintiff attempts to justify searching these custodians' files based solely on pure speculation.  Plaintiff's request must be denied.

### A.    Mr. Robins and Mr. Avello do not have any unique, discoverable information about Plaintiff's account.

A party is obligated to conduct a reasonable and proportional search for information, not to look for "every single [potentially relevant] document" sought by the other side.  *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09-CV-02137 LTS SN, 2013 WL 4838796, at *2 (S.D.N.Y. Sept. 11, 2013).  And when a party demands to search the files of "apex" employees, it must demonstrate that those employees "are likely to be the exclusive holders of responsive documents."  *Id.*  Without such a showing, courts have refused to include senior employees as custodians mearely based on speculation. *See id.* (rejecting request to include senior employees as custodians); *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 106 (S.D.N.Y. 2013) (declining to include members of management group absent showing that these individuals would have unique information); *Roblox Corp. v. WowWee Grp. Ltd.*, No. 22-cv-04476-SI, 2023 WL 5507176, at *3 (N.D. Cal. Aug. 25, 2023) (declining to include President as custodian as requesting party failed to show that President would have information not already obtained from other custodians); *Handloser v. HCL Am., Inc.*, No. 19-cv-01242-LHK-VKD, 2020 WL 7405686, at *2 (N.D. Cal. Dec. 17, 2020) (refusing to add two executive custodians where plaintiffs failed to demonstrate they had unique information).

Here, none of the requested custodians are likely to have any discoverable information related to Plaintiff's account. None of these custodians monitored or serviced Plaintiff's account.  Even if any of them had documents regarding Plaintiff's account, they would be duplicative of information that DraftKings has already searched and produced. Communications from individual users are not normally routed to senior DraftKings employees.  Instead, they are sent to a user's hosts, or to members of DraftKings' Customer Service team. To that end, DraftKings has identified **16** custodians who—unlike Messrs. Robins and Avello—communicated with Plaintiff regarding his account or investigated Plaintiff's claims that his account was compromised. These custodians

Coblentz
Patch Duffy
& Bass LLP

The Hon. Vera M. Scanlon
December 5, 2024
Page 5

include (a) four "VIP hosts" who communicated with Plaintiff about his account; (b) two other "VIP hosts" and the Vice President of VIP Growth, each of whom were made aware of Plaintiff's complaints about his account; and (c) 10 employees from DraftKings' Risk Operations, Fraud, or Customer Service teams, who investigated Plaintiff's complaints regarding his account.

Tellingly, despite receiving numerous productions from DraftKings, Plaintiff cannot point to a single document to support his position that Messrs. Avello or Robins would have documents related to Plaintiff's account. Nor can Plaintiff articulate what he is looking for that is not already covered by his current document requests from the current custodians. Among other things, DraftKings has produced (a) numerous internal communications regarding its investigation into Plaintiff's complaints about his account; (b) technical documentation from DraftKings' database tracking the individuals who accessed his account; and (c) spreadsheets memorializing Plaintiff's user history, account geolocation data, and wager history.[1] Not a single document references either of the two custodians or suggests that they had files related to Plaintiff's account. Simply put, there is no basis to believe that these custodians have any documents relevant to this dispute at all, let alone that they are the *exclusive* holders of such documents.[2]

> **B.     Plaintiff's basis for including these custodians is premised on pure speculation.**

Plaintiff argues that (a) Mr. Robins and Mr. Avello allegedly communicated about Plaintiff's account because they attended two industry conferences where they allegedly spoke to Kyrollos[3] about Plaintiff; (b) Kyrollos asserted in his podcast that he messaged

---

[1] DraftKings made rolling productions of these materials on September 13, September 20, October 1, October 18, November 4, November 6, and December 3.

[2] Plaintiff previously also demanded that DraftKings include Stanton Dodge (DraftKings' Chief Legal Officer) as a custodian. Plaintiff has now backtracked from that position, dropping Mr. Dodge from his letter. Indeed, there was never any basis to search Mr. Dodge's files. Not only is he unlikely to have any responsive, non-cumulative information, virtually all of his communications are privileged. *N. Cnty. Commc'ns Corp. v. Verizon Glob. Networks, Inc.*, 2012 WL 12870300, at *3 (S.D. Cal. Oct. 31, 2012) (denying motion to compel production of in-house counsel communications as "the vast majority of those communications are subject to attorney-client privilege and work-product protection").

[3] Kyrollos is a third party who allegedly plotted to assault Plaintiff. *See* ECF No. 20 (Amended Compl.) ¶¶ 32–33, 21–22.

Coblentz
Patch Duffy
& Bass LLP

The Hon. Vera M. Scanlon
December 5, 2024
Page 6

Mr. Robins; and (c) that DraftKings' position "has no legal justification."  None of these points are availing.

Plaintiff's assertions that Messrs.  Avello and Robins attended conferences where Kyrollos was allegedly in attendance—even if credited—does not mean that either individual communicated about Plaintiff or his account.  Indeed, Plaintiff does not claim to have been at any of these conferences or to have witnessed Mr. Avello or Mr. Robins allegedly discuss his account with Kyrollos.[4]  And his letter provides *zero* corroborating evidence for his incredible assertion that DraftKings disclosed Plaintiff's information to Kyrollos "at or around" the 2023 MIT Conference.  As such, Plaintiff can rely only on pure speculation to assert that these conferences provide him a basis to search Mr. Avello's and Mr. Robins' files.[5]

As alleged "support" for his position, Plaintiff asserts that Kyrollos "confirmed" in his podcast that he had a "personal relationship" with Mr. Robins. Not so. Kyrollos merely asserted that he messaged Mr. Robins "several times."[6]  Tellingly, neither Kyrollos nor Plaintiff say what Kyrollos purportedly said to Mr. Robins, or even articulated if these purported messages occurred during the operative time period of this case.  Indeed, Kyrollos did not say that Mr. Robins even responded to him.  Notably, Kyrollos has publicly disclaimed Plaintiff's allegations, noting that Plaintiff was actually borrowing Kyrollos' money to place wagers, but later refused to return a portion of his earnings. *See* Ex. A .

Plaintiff boldly claims that DraftKings' position has "no legal justification."  This is facially wrong.  As shown above, numerous courts—both inside and outside of the Second Circuit—have refused to order the search of executive or senior-manager files because they were unlikely to include any unique, non-cumulative information. Indeed, Plaintiff cannot cite a single case to support his position.

---

[4] Indeed, as Plaintiff himself stated, these conferences were about general industry topics*, not* about Plaintiff.  *See* ECF 33-5 Ex. B (representing that Mr. Avello spoke at a panel on "Ethics on Sports Betting" at BetBash conference); *id.* ¶16, Ex. E (representing that Mr. Robins attended a panel about "The Future of Sports & Entrepreneurship" at the 2023 MIT Sloan Conference).

[5] For this reason, Plaintiff is also not entitled to search the files of any employees who accompanied Messrs. Avello and Robins to any of these conferences. Plaintiff does not assert that any of these employees participated in any of these panels, met with Kyrollos, or had communications relating to Plaintiff's account.

[6] Plaintiff apparently refers to a portion of the November 22, 2024 episode of Kyrollos' "Be Better Bettors" podcast beginning at 1:04:00.

Coblentz
Patch Duffy
& Bass LLP

The Hon. Vera M. Scanlon
December 5, 2024
Page 7

Plaintiff first attempts to distinguish the *Morgan Stanley* court's refusal to include several senior executives on custodians because that case involved a larger set of search terms and document discovery. *See* 2013 WL 4838796, at *2. That distinction only harms, not helps, Plaintiff's claim. Ultimately, *Morgan Stanley*'s holding was based on Federal Rule of Civil Procedure 26. *See id.* at *1. Those rules require that discovery in *any* civil case be relevant and proportional. *See id.* And discovery is far narrower in this case than in *Morgan Stanley* because the Court's August 12 Order limited the scope of discovery only to the narrow issue of information related to Plaintiff's account. Given that circumscribed scope, this Court has even stronger grounds than in *Morgan Stanley* to exclude Messrs. Avello and Robins as custodians under Rule 26.

Plaintiff also cannot rely on *Rosinbaum v. Flowers Foods, Inc*., 238 F. Supp. 3d 738, 750 (E.D.N.C. 2017), as the court there *did not include* the defendant's senior executives as document custodians. Instead, the court ultimately assumed without deciding that the apex doctrine "*may apply to* requests for document production". *See id.* (emphasis added). After doing so, the court merely held the plaintiff's motion to compel in abeyance because it "lack[ed] sufficient information to address these issues of duplication and proportionality." *Id.* Here, DraftKings has made a sufficient showing of relevance and proportionality to deny Plaintiff's request altogether.

Further, in *Sanders v. Suny Downstate Med. Ctr.*, 2024 U.S. Dist. LEXIS 166658, at *9 (E.D.N.Y. Sept. 16, 2024), the court ordered that a CEO's files be searched only after a showing that CEO herself exchanged direct correspondence with the Plaintiff and "met with him personally to discuss her complaints." If anything, this case shows the heightened standard that Plaintiff must meet to justify the search of an executive's files. There is *no evidence* here that Mr. Robins met with or exchanged emails with Plaintiff.

**II. Plaintiff's other comments about the status of discovery are inaccurate and premature.**

Although Plaintiff admits that the parties have reached an impasse only on the apex-custodian issue, he nonetheless includes numerous assertions about the status of DraftKings' document production. He claims that DraftKings (a) delayed in certifying completion of its document production and produced "only twenty-five" new documents; (b) delayed in providing a privilege log; and (c) did not "provide[] necessary information" related to certain technical documents." Not only is Plaintiff's description of these issues inaccurate, his inclusion of them in this letter is a direct violation of the Court's November 7 Order, which ordered the parties only to include issues for which they reached an impasse. While DraftKings briefly responds to correct the record on these issues, on that basis alone, Court should disregard each of Plaintiff's complaints.

***Status of Document Production***: Plaintiff's insinuation that DraftKings has been dilatory in completing its production of documents is inaccurate. DraftKings' recent productions

Coblentz
Patch Duffy
& Bass LLP

The Hon. Vera M. Scanlon
December 5, 2024
Page 8

are a sign only that the company has gone above and beyond in fulfilling its discovery obligations; at each turn, it has agreed to broaden its search for responsive documents in order to avoid burdening the Court with needless disputes. Indeed, on November 12, after the November 7 discovery conference, Plaintiff demanded that DraftKings search some 11 additional custodians.  DraftKings did not agree with Plaintiff that it was required to search any of these additional custodians. Nonetheless, to avoid burdening the Court, on November 20 and November 26, DraftKings offered to search for *nine* more custodians, including *six* that Plaintiff had requested.  In parallel, in connection with preparing its privilege log, DraftKings also identified several documents that could be produced with attorney-client-privileged communications redacted.  After agreeing to broaden its custodial set, DraftKings then produced documents on December 3 and December 4. The fact that a review of some of Plaintiff's requested custodians yielded fewer than 25 responsive documents is far more indicative of the paucity of evidence supporting his claims than of any failure by DraftKings to fulfill its discovery obligations.

***Privilege Log:*** DraftKings individually reviewed each responsive document and withheld or redacted any documents containing privileged materials, including emails reflecting attorney-client communications. DraftKings will produce a privilege log to Plaintiff. Because DraftKings had agreed—in the spirit of compromise—to search for additional custodians that Plaintiff requested, DraftKings required additional time to prepare its privilege log. DraftKings expects and hopes that any concerns that Plaintiff may have regarding its log will be informally resolved between the parties.

***Technical Documents***: On November 6, 2024, DraftKings produced a copy of an "audit log" (DRAFTKINGS_DOE0000561) that identifies DraftKings employees that accessed Plaintiff's account.  On November 20, Plaintiff complained that he could not interpret or read certain fields in that log.  On a December 2 telephonic meet and confer, Plaintiff requested a key or other document that would explain the fields in this spreadsheet. DraftKings is in the process of evaluating Plaintiff's request.

Respectfully Submitted,

*/s/ Steven B. Jacobs*

Steven B. Jacobs
Plaintiff


*/s/ Rees Morgan*

Rees Morgan
Counsel for DraftKings

# EXHIBIT A
# TO DRAFTKINGS' PORTION OF JOINT LETTER BRIEF



spanky ✓
@spanky                                    Follow

My statement:
Let's address Mr. 'John Doe' aka Steve Jacobs (Yes, you read that right, the plaintiff and the plaintiff's attorney are the same person!)

Plaintiff / plaintiff's attorney Steve Jacobs is also a Senior Attorney who works at Herbert Smith Freehills Law Firm in New York City.

As background, my buddy Oscar Jones met Steve through a personal connection and was under the impression that Steve was a "whale" that we believed we could flip to get down.

In layman's terms, a "whale" is a losing player that can bet big on all of our behalf because the sportsbook, seeing his history of losing bets, has given him increased betting limits, hoping he will lose even more.

We would send Oscar the plays, Oscar would send them to Steve Jacobs and Steve Jacobs would then punch them in his account. (For those unaware of the betting landscape, I rely on guys like Steve Jacobs to bet, given DraftKings (DK) doesn't allow me to bet at their establishment because I win). Oscar even gave Steve $82,375 of his own money to get the partnership started.

After a few months, and with the benefit of our consultation (via Oscar), naturally Steve won a substantial amount of money.

Fast forward 2 months to when it's time to settle up the proceeds of our partnership. Steve Jacobs -- Steve claimed DK was holding up the payout. He claimed that DK was asking him to sign an "affidavit of eligibility". Oscar and I each advised him to file a complaint with the New York Gaming Board. Initially he refused, but we were insistent that he take up the matter with the regulatory authorities, and eventually he agreed to do that.

On February 6, 2023 at 8:33p Steve filed a complaint with NY Gaming via email and BCC'd Oscar on that email to "prove" he'd filed it.

For more than a month after that, Steve told us both that he had not yet received a response to the complaint he filed with regulators, and that he was still waiting with "fingers crossed".

Oscar and I both started to get suspicious.

My strategy of following up on my suspicion was a test for Steve Jacobs. I told him -- bluffing -- that I had the ability to receive information on the status of the payout from DK (I obviously do not have that power, nor am I connected with anyone who does have that power, given I am banned from betting at DK). I wanted to gauge Steve's response to my bluff; in particular, I was hopeful that if he was doing something wrong, that this bluff might encourage him to fess up. Steve maintained that DK was holding up his withdrawal request, and that he was waiting on a response to a complaint he filed with the New York Gaming Board.

Oscar then had a brilliant strategy for following up on our suspicion; he had the idea to use New York's Freedom of Information Law (FOIL) to request, from the regulators, copies of the complaint that Steve Jacobs said he had filed against DK. What comes next is crazy! What Steve Jacobs never admitted to us was literally 5 minutes after filing the complaint, he sent them a second email at 8:38 pm on February 6, 2023 saying that the complaint he "filed" in his first email was an "accident". 5 minutes!

In his "accident" letter, he apologized - saying he was a "gaming lawyer and drafted it for a gaming training module". Both the complaint and cancellation can be seen attached below and can be freely obtained via FOIL.

I believe one of three things happened: Either 1) Steve Jacobs wound up stealing the money, or (2) he gambled it all away or (3) he just booked our bets himself (instead of placing the bets at DK) - hoping we would lose.

The evidence seems to show that Steve Jacobs is either a sick compulsive gambler or a thief. My bet is on both. Either way he needs help.

I wound up talking to Steve Jacobs and he admitted to me that he owes over a million dollars ($1,000,000.00) to other people. He has a reputation in the poker community of being unhinged (forumserver.twoplustwo.com/showpost.php?p...) (1/2)



5:32 PM · Jun 25, 2024 · 518.9K Views

48 Reposts   51 Quotes   420 Likes   151 Bookmarks