UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STEVEN JACOBS,

        *Plaintiff,*

– against –

DRAFTKINGS INC.,

        *Defendant.*

**MEMORANDUM & ORDER**
24-cv-03077 (NCM) (VMS)

**NATASHA C. MERLE**, United States District Judge:

Before the Court is defendant's motion to dismiss plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Plaintiff Steven Jacobs brings this action pursuant to the Court's diversity jurisdiction against DraftKings Inc. ("DraftKings") for several alleged common law torts relating to the treatment of his personal information and alleged threatening behavior aided by DraftKings' employees. Am. Compl., ECF No. 20. For the reasons stated below, defendant's Motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

Plaintiff is a former customer of defendant DraftKings, a prominent sports betting company. Am. Compl. ¶¶ 4–5. Plaintiff alleges that DraftKings assisted several third parties, including a bettor named Gadoon "Spanky" Kyrollos, in threatening plaintiff by

---

[1] The Court hereinafter refers to the Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint, ECF No. 33-1, as the "Motion"; plaintiff's Memorandum of Law in Opposition to the Motion, ECF No. 33-4, as the "Opposition"; and the Reply Brief in support of the Motion, ECF No. 33-6, as the "Reply."

gaining access to his personal information, waiting outside his home, and assaulting him on his way to the subway. Am. Compl. ¶¶ 1–2.

Plaintiff was a "VIP" customer at DraftKings for over a year and worked with a "VIP host," Joe Di Chiaro, to place his bets during that time. Am. Compl. ¶¶ 17, 19. Around February 2023, plainitff alleges that Spanky "began extorting" him by claiming entitlement to "funds held in Plaintiff's DraftKings account." Am. Compl. ¶¶ 20, 22. As part of this campaign, Spanky "indicated he had dangerous associates" as well as "acquaintances in the 'upper echelon' of DraftKings." Am. Compl. ¶¶ 23, 25. Plaintiff further alleges that Spanky told him he planned to attend a sports betting conference[2] "where DraftKings would provide him any and all information he requested regarding Plaintiff's account." Am. Compl. ¶ 23.

Plaintiff alleges that he reported his conversations with Spanky to Di Chiaro, who "seemed shocked" and "said that he would do everything he could to help ensure that nothing was improperly leaked to Spanky or anyone else." Am. Compl. ¶ 28. Despite this assurance, Spanky's "associate," Oscar Jones, "made it abundantly clear in emails and text messages that he and Spanky had received Plaintiff's personal and financial information from DraftKings." Am. Compl. ¶ 31. Shortly thereafter in late March 2023, plaintiff alleges

---

[2] The parties each ask the Court to take judicial notice of several exhibits not contained in plaintiff's amended pleading, including online information about the sports betting conference and DraftKings' privacy notice. *See* ECF Nos. 33-2, 33-5. While the Court may take judicial notice of certain matters pursuant to Federal Rule of Evidence 201, it declines to do so here for two reasons. *See Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 148 (S.D.N.Y. 2022). First, judicially noticed materials may "be considered only for the fact that" the information was presented—not for the truth of the information contained therein. *Id*. While styled as a request for judicial notice, plaintiff's filing consists of factual statements supported by additional exhibits, thereby improperly requesting that the Court consider the truth of the matters asserted in those exhibits. *See* Pl.'s Req. Jud. Not., ECF No. 33-5. Second, the Court finds that the materials defendant presents for judicial notice are not necessary to consider when evaluating the Motion.

that he was attacked by an unnamed, masked man on the subway platform while commuting to work. Am. Compl. ¶ 32. Plaintiff alleges that, upon hearing about this incident, "Di Chiaro's attitude appeared to have changed completely" and he "stonewalled" plaintiff by refusing to provide information on DraftKings' "investigation regarding the information that it provided to Spanky." Am. Compl. ¶¶ 35–37. Plaintiff alleges that his "life has not been the same" since the incident, which caused him "severe emotional distress." Am. Compl. ¶ 39.

Plaintiff further alleges that in October 2023, his DraftKings account email address had been changed such that he could no longer access the account online. Am. Compl. ¶¶ 43–44. According to the complaint, "DraftKings intentionally changed the address to assist a bad actor" or "completely neglected to follow its own procedures with respect to changing Plaintiff's registered email." Am. Compl. ¶ 48. Plaintiff alleges that he initially spoke with a DraftKings VIP host, Taylor O'Brien, who at first "appeared to understand the seriousness of the situation," but O'Brien was later "ordered" by the "upper echelon" at DraftKings "not to provide any further information" to plaintiff. Am. Compl. ¶¶ 50–55. Plaintiff believes that "the upper echelon of DraftKings assisted Spanky" with the October 2023 "hack" of plaintiff's account. Am. Compl. ¶ 67.

Plaintiff alleges that the March and October 2023 incidents were part of a "year-long deliberate and malicious campaign of harassment and intimidation against" plaintiff and, as a result, plaintiff "has been terrified for his safety ever since." Am. Compl. ¶¶ 70–71. Thus, plaintiff brought this action against DraftKings seeking monetary damages for several common law torts arising out of these alleged incidents: aiding and abetting

assault and battery, intentional and negligent infliction of emotional distress, and negligent supervision and retention.3 Am. Compl. ¶¶ 72–106.

## LEGAL STANDARD

When deciding a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014).4 Factual disputes are typically not the subject of the Court's analysis, as Rule 12 motions "probe the legal, not the factual, sufficiency of a complaint." *Plastic Surgery Grp., P.C. v. United Healthcare Ins. Co. of N.Y., Inc.*, 64 F. Supp. 3d 459, 468–69 (E.D.N.Y. 2014). That is, "the issue" on a motion to dismiss "is not whether a plaintiff will ultimately prevail," but instead whether a plaintiff is "entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012). Accordingly, "[d]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 125 (2d Cir. 2023).

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must state "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is

---

3   The Amended Complaint lists the following under one cause of action: "Negligence, Negligent Supervision and Retention, Negligent Infliction of Emotional Distress." Am. Compl. 18. In his opposition brief, plaintiff does not address any standalone negligence claim. *See* Opp'n 24–27. Accordingly, the Court does not consider whether plaintiff has stated a claim for negligence other than negligent supervision and retention and negligent infliction of emotional distress.

4   Throughout this Opinion, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

4

plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Although the Court takes all factual allegations contained in the complaint as true, it does not do so for legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" in a complaint. *Iqbal*, 556 U.S. at 678. Furthermore, although the Court generally "construe[s]" a *pro se* plaintiff's "submissions liberally," *Whitfield v. City of New York*, 96 F.4th 504, 518 (2d Cir. 2024), the Court "does not give special solicitude to *pro se* litigants who are themselves attorneys," *Chevron Corp. v. Donziger*, 990 F.3d 191, 203 (2d Cir. 2021).

Federal courts sitting in diversity apply the substantive law of the forum state. *Burt Rigid Box, Inc. v. Traveler's Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

### I. Vicarious Liability

Plaintiff brings several claims against DraftKings under a theory of vicarious liability. Pursuant to New York law, "an employer may be vicariously liable for the tortious acts of its employees only if those acts were committed in furtherance of the employer's business and within the scope of employment." *A.W. by E.W. v. New York Dep't of Educ.*, 702 F. Supp. 3d 46, 52 (E.D.N.Y. 2023). An employee acting within the scope of employment generally acts in furtherance, or in service, of the employer's interests. *See Rosenfeld v. Lenich*, 370 F. Supp. 3d 335, 350 (E.D.N.Y. 2019) ("[A] plaintiff must plead facts that plausibly allege that the predicate torts were committed within the scope of the employee's duties to the employer and was thus in furtherance of the employer's interests."). Defendant contends that it cannot be held vicariously liable for the claims of aiding and abetting battery or assault, or intentional infliction of emotional distress,

5

because plaintiff failed to allege that DraftKings' employees acted within the scope of their employment. Mot. 11.[5] Conduct is within an employee's scope of employment if it "is generally foreseeable and a natural incident of the employment." *A.W. by E.W.*, 702 F. Supp. 3d at 52. This inquiry is "fact-dependent" and "typically left to the jury." *Id*. at 53. Relevant factors include "the time, place[,] and occasion for the act" and the employer-employee relationship "as spelled out in actual practice," although foreseeability is generally provided more weight. *Id*.

Plaintiff contends that the "*only* reasonable inference" based on the allegations in the complaint is that defendant "made a business decision" to work with Spanky to threaten plaintiff. Opp'n 15 (emphasis in original). To support this inference, plaintiff alleges that he "reported" to Di Chiaro that:

> Spanky (i) was a very dangerous individual; (ii) had claimed to be connected all the way up to the 'upper echelon' of Draftkings; (iii) had claimed that he was going to attend a conference in Boston at which DraftKings would provide him with Plaintiff's private personal and sensitive financial information, including Plaintiff's address, as well as his financial, banking, and betting history; and (iv) that he intended to use information that he received from DraftKings to extort Plaintiff, threaten Plaintiff, and/or potentially injure or kill Plaintiff.

Am. Compl. ¶ 26.

The fact that this exchange was anticipated at a sports betting "conference" where DraftKings employees would be in attendance supports a reasonable inference that the leak may have occurred during a work function. Of course, several factual gaps remain regarding where, when, or how Spanky intended to obtain plaintiff's personal information

---

[5] Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

at the conference—for example, during a panel discussion, private meeting, or an after-hours dinner. These details are relevant to the fact intensive inquiry as to whether DraftKings' employees provided Spanky with plaintiff's information during the scope of their employment, which would support vicarious liability for aiding and abetting battery or assault, or intentional infliction of emotional distress. But plaintiff's allegations nonetheless support a plausible inference that they did so during a work function and therefore could have been acting within the scope of their employment. *See Doe v. Hilton Cent. Sch. Dist.*, 720 F. Supp. 3d 184, 197 (W.D.N.Y. 2024) (noting that "discovery could swing this entire analysis the other way" regarding an employer's vicarious liability).

Furthermore, these allegations bear directly on whether the alleged tortious conduct in 2023 was foreseeable to DraftKings. Specifically, plaintiff alleges that prior to the March 2023 incident on the subway platform he reported his conversation with Spanky to Di Chiaro, who represented that he would take steps to safeguard plaintiff's information. Am. Compl. ¶ 28. That report and reaction by Di Chiaro suggest that defendant was on actual notice that its "upper echelon" might somehow "provide [Spanky] with Plaintiff's private personal and sensitive financial information." *See* Am. Compl. ¶ 26. With respect to the October 2023 incident, plaintiff also alleges that he exchanged messages with several DraftKings employees, including Di Chiaro and O'Brien, regarding the allegedly erroneous change to his account email address. Am. Compl. ¶¶ 43–45, 50. Thereafter, plaintiff requested information regarding the nature of the email address change and received email responses from DraftKings, including its privacy department, regarding "its investigation" and related files, which plaintiff alleges was a "systematic cover-up." Am. Compl. ¶¶ 52–68. These exchanges plausibly suggest that the alleged provision of plaintiff's private information to third parties, including Spanky, was

7

"generally foreseeable" to DraftKings and therefore plausibly occurred during the scope of its employees' employment. *See A.W. by E.W.*, 702 F. Supp. 3d at 52.

Defendant also contends that its privacy rules protect against disclosure of customers' personal information, and therefore any disclosure in violation of those rules would necessarily fall outside of the employee's scope of employment. Mot. 13. However, even if DraftKings' privacy rules require employees to "use reasonable efforts to protect" customer information, defendant provides no authority that a potential violation of a written company policy is a *per se* bar to the fact-specific vicarious liability determination. *See* Mot. 13. In fact, "an employee's disregard of instructions is an almost inevitable feature of vicarious liability claims involving intentional torts." *Norwood v. Simon Prop. Grp., Inc.*, 159 N.Y.S.3d 482, 486 (2d Dep't 2021) (noting that employee's conduct "prohibited by the [] defendants' policy was not necessarily unforeseeable"); *see also A.W. by E.W. v. New York Dep't of Educ.*, 519 F. Supp. 3d 128, 140–41 (E.D.N.Y. 2021) (noting that violation of state regulations "does not necessarily mean that a[ state] employee's actions were outside the scope of employment"); *Rosenfeld*, 370 F. Supp. 3d at 352 (finding that employee's "forgery of judicial orders and subpoenas and unlawful wiretapping" did not foreclose employer's vicarious liability). Moreover, DraftKings' employees may have been using "reasonable" efforts to protect plaintiff's information, as plaintiff alleges Di Chiaro promised to do, and therefore complying with company policy when the information was nonetheless leaked to a third party. Indeed, the allegations that Di Chiaro responded to plaintiff's report by promising to "do everything he could to help ensure that nothing was improperly leaked to Spanky or anyone else," Am. Compl. ¶ 28, suggests that the leak may have occurred *despite* DraftKings' employees' compliance with the privacy policy.

8

Accepting the allegations in the complaint as true, and drawing all reasonable inferences in plaintiff's favor, the Court finds that plaintiff has sufficiently pled vicarious liability.[6] Furthermore, for the reasons stated below, plaintiff has sufficiently alleged a claim for aiding and abetting assault and battery but has failed to adequately plead a claim for intentional infliction of emotional distress.

### A. Aiding & Abetting

Pursuant to New York law, claims for aiding and abetting tortious conduct require a plaintiff to plead "(1) the existence of an underlying tort; (2) the defendant's knowledge of the underlying tort; and (3) that the defendant provided substantial assistance to advance the underlying tort's commission." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012); *see also Naughright v. Weiss*, 826 F. Supp. 2d 676, 691 (S.D.N.Y. 2011) ("New York specifically recognizes a cause of action for aiding and abetting an assault and battery."). Aiding and abetting claims "stand[] or fall[] with the underlying tort" claim. *Naughright*, 826 F. Supp. 2d at 692. Here, plaintiff alleges assault and battery in the form of a "death threat": "a man" approached him on the subway, "grab[bed] his arm," and told plaintiff that if he did not pay money owed to Jones, plaintiff "did not want to know what

---

[6] Plaintiff also argues that the "only plausible reason for DraftKings risking their reputation to send a team of employees to work with Spanky is that a close relationship with Spanky . . . is profitable for DraftKings." Opp'n 16. However, plaintiff has failed to allege a direct connection between the provision of plaintiff's private information and a financial benefit to DraftKings. His arguments that defendant and Spanky had a business relationship, *see* Opp'n 15, are not based on his allegations in the complaint, and such a conclusory allegation would be nonetheless insufficient to plausibly suggest that defendant financially benefitted from the alleged information leak. Indeed, as defendant points out, plaintiff alleges that a customer information leak "could cause a major problem for the company." Am. Compl. ¶ 28; *see* Reply 8. Nevertheless, such a potential issue does not foreclose DraftKings' vicarious liability, as plaintiff has sufficiently alleged that defendant's employees were not acting on "wholly personal motives." *See N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002).

[the man] would do to" him. Am. Compl. ¶¶ 32–34; Opp'n 11. This is sufficient to plead the underlying torts of assault and battery pursuant to state law.

New York law defines assault as "an intentional placing of another person in fear of imminent harmful or offensive contact" and battery as "an intentional wrongful physical contact with another person without consent." *Freeman v. Jacobson*, No. 20-cv-10040, 2021 WL 3604754, at *9 (S.D.N.Y. Aug. 13, 2021). As to battery, plaintiff alleges physical violence on the subway platform: the man (who allegedly received plaintiff's information from Spanky or Jones) "twisted Plaintiff's arm and aggressively spun Plaintiff around on the subway platform." Am. Compl. ¶ 32. As to assault, plaintiff alleges "fear of imminent harmful or offensive contact," *Freeman*, 2021 WL 3604754, at *9, by way of the man's statement that he knew where plaintiff lived and worked and threatened plaintiff by stating that he "did not want to know" what would happen if plaintiff did not pay money to Jones, Am. Compl. ¶ 33.

However, defendant contends that plaintiff has failed to allege substantial assistance to support aiding and abetting of assault or battery. Mot. 16. A defendant provides "substantial assistance" if it "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling" the tortious conduct. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006). Inaction may constitute substantial assistance only where a defendant "owes a fiduciary duty directly to the plaintiff." *Id.* The parties dispute whether plaintiff has pled (i) affirmative assistance or (ii) inactive assistance.

As to affirmative assistance, plaintiff claims that defendant substantially assisted the assault and battery by providing "Spanky and/or others" with plaintiff's personal information, "which gave Spanky the means and desire to send 'muscle' to make the Death Threat." Am. Compl. ¶ 35; *see* Opp'n 18–19 ("The *only* reasonable inference is that

DraftKings intended [to] aid the assault and battery.") (emphasis in original). As noted *supra*, plaintiff also alleges that he warned defendant that Spanky was planning to obtain plaintiff's personal information from DraftKings and use it to threaten plaintiff. Am. Compl. ¶¶ 17, 26. However, plaintiff alleges that DraftKings' employee, Di Chiaro, responded to plaintiff's warning by implementing "added security" for plaintiff's information. Am. Compl. ¶ 29. The complaint then leaps ahead, asking the Court to draw an inference that the "security measures" put in place to safeguard his information "did not work" and instead DraftKings leaked plaintiff's private information. Am. Compl. ¶¶ 29–30, 35. These allegations are conclusory. The Court cannot reasonably infer that DraftKings provided the missing link—substantial affirmative assistance—by disclosing plaintiff's private information to a third party in furtherance of the masked man's assault and battery of plaintiff.

Plaintiff also argues that inactive substantial assistance is adequately pled because defendant owed him a fiduciary duty. Opp'n 19–20. Specifically, plaintiff contends that DraftKings carries "similar responsibilities" and regulatory requirements as banks, which owe fiduciary duties to their customers. Opp'n 19. However, a "conventional business relationship" is insufficient to support a fiduciary relationship. *42-50 21st St. Realty LLC v. First Cent. Sav. Bank*, No. 20-cv-05370, 2022 WL 1004187, at *6 (E.D.N.Y. Apr. 4, 2022). Instead, "[t]o establish the existence of a fiduciary relationship, a plaintiff must allege that it has reposed trust or confidence" in defendant such that "the relationship" between plaintiff and defendant "exhibit[s] the characteristics of de facto control and dominance." *Id.*; *see also Neogenix Oncology, Inc. v. Gordon*, 133 F. Supp. 3d 539, 554 (E.D.N.Y. 2015)("[A] fiduciary relationship exists only when a person reposes a high level

of confidence and reliance in another, who thereby exercises control and dominance over him.").

Here, plaintiff alleges that DraftKings' VIP host Di Chiaro "recruit[ed]" and "induced" plaintiff to engage in legal sports betting with defendant "by offering bonuses and other VIP perks." Am. Compl. ¶ 17. Plaintiff characterizes his relationship with Di Chiaro as one of trust and "akin to a friendship." Am. Compl. ¶ 18; *see also* Am. Compl. ¶ 26 (alleging that plaintiff "fully trusted" Di Chiaro). Plaintiff further alleges that after he reported his conversation with Spanky, Di Chiaro "reassured" plaintiff that his information was "completely safe and secure" and DraftKings would "put a stop" to any efforts to gain access to plaintiff's personal information. Am. Compl. ¶ 29. Viewed in the light most favorable to plaintiff, these allegations suggest that defendant built a relationship of trust and promised that plaintiff's personal information would be secure. *See Marini v. Adamo*, 995 F. Supp. 2d 155, 202 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016) (summary order) (finding fiduciary duty based on relationship of "confidence and reliance"). At the pleading stage, this is sufficient to support plaintiff's contention that defendant owed him a fiduciary duty.

Furthermore, defendant's alleged failure to act to protect plaintiff's private information, *see* Am. Compl. ¶ 30, could plausibly constitute substantial assistance in light of the alleged fiduciary relationship between plaintiff and DraftKings. *See Lerner*, 459 F.3d at 295. While plaintiff has not alleged exactly how Spanky or the masked man obtained his personal information, plaintiff has alleged that he put defendant on notice of potential criminal activity to gain access to plaintiff's information, which then allegedly came to fruition. *See* Am. Compl. ¶¶ 26–35. The Court finds the inference that DraftKings knew of this potential and failed to act to safeguard that information reasonable based on

12

these allegations. Accordingly, plaintiff has sufficiently pled claims against DraftKings for aiding and abetting assault and battery.

## B. *Intentional Infliction of Emotional Distress*

Plaintiffs asserting intentional infliction of emotional distress ("IIED") claims must clear an "extremely high" bar by plausibly alleging: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Sesto v. Slaine*, 171 F. Supp. 3d 194, 201 (S.D.N.Y. 2016). Conduct satisfies the first element only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id*. Claims for IIED are "highly disfavored and almost never successful." *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 415 (S.D.N.Y. 2023). This is so in part because such claims are often duplicative of claims for negligence and dismissed on that ground alone.[7] *Id*.

Defendant contends that plaintiff has failed to plead extreme and outrageous conduct. Mot. 18. Plaintiff responds by pointing to his allegations that DraftKings assisted in the "attack and Death Threat on one of its customers, the gaslighting of that customer, assisting a hack into his account, and engaging in a systematic year-long coverup." Opp'n 21. These allegations relate to the incidents in March and October 2023, neither of

---

[7] Plaintiff contends that "[a]lthough the assault, battery and Death Threat is certainly *part* of Plaintiff's IIED claim, as is [the] hack into his account, the claim also extends to DraftKings' systematic and ongoing campaign of lies and betrayal over the course of nearly a year." Opp'n 24 (emphasis in original). However, the Court discerns no difference between these allegations—plaintiff's IIED claim is based on the same allegations relating to the March and October 2023 incidents that underlie his other claims. Accordingly, the IIED claim is duplicative of the others, which itself provides "sufficient grounds for dismissal." *Doe 1*, 671 F. Supp. 3d at 415.

13

which is sufficiently pled to meet the high bar for extreme and outrageous conduct. *Cf. Truman v. Brown*, 434 F. Supp. 3d 100, 119 (S.D.N.Y. 2020) (noting that even "false accusations of criminal conduct, or conduct that society deems reprehensible, do not inherently establish IIED"); *Blanco v. Success Acad. Charter Sch.*, Inc., 722 F. Supp. 3d 187, 220 (S.D.N.Y. 2024) (explaining that even conduct that is "humiliating, insulting and intended to intimidate" is not sufficient for an IIED claim).

*First*, plaintiff alleges that DraftKings provided substantial affirmative assistance in the release of his private information in March 2023. However, as discussed above, these allegations are not sufficiently pled. For example, plaintiff alleges that Jones "made it abundantly clear in emails and text messages that he and Spanky had received Plaintiff's personal and financial information from DraftKings." Am. Compl. ¶ 31. Yet, plaintiff's allegations in this regard are thin. He does not allege, for instance, how Jones made this "abundantly clear" despite plaintiff receiving the communications from Jones and presumably having the factual basis for his conclusion. This information is crucial as affirmatively providing plaintiff's secure information is fundamentally different than inadvertently leaking plaintiff's information. Thus, even viewing this allegation in the light most favorable to plaintiff, the complaint fails to provide more than a conclusory statement as to whether defendant intentionally released plaintiff's private information to Spanky or Jones and does not support an allegation of extreme or outrageous conduct on behalf of DraftKings.

*Second*, plaintiff alleges that in October 2023 defendant "intentionally assisted a hacker in taking control of Plaintiff's DraftKings account," Am. Compl. ¶ 49, and "engaged in a systematic cover-up" of the March information leak and the October hack. Am. Compl. ¶ 68. Similar to the allegations concerning disclosure of his personal

information, plaintiff does not allege any facts to support these conclusory allegations. For example, plaintiff alleges that he complained about his account security once his DraftKings email address was changed and was told by DraftKings that his account was safe, but that DraftKings somehow gave Spanky his information nevertheless. However, plaintiff does not explain how he believes DraftKings leaked his information or the intent behind the leak. *See* Am. Compl. ¶¶ 26–31. Nor does plaintiff allege that the change to his registered email address was made with any intent to cause him harm. *See* Am. Compl. ¶¶ 43–49. These allegations are simply conclusory and, regardless, fail to allege action that would clear the "extremely high" bar to establish conduct that reaches "beyond all possible bounds of decency." *Sesto*, 171 F. Supp. 3d at 201 (S.D.N.Y. 2016).

Accordingly, plaintiff has failed to sufficiently plead an IIED claim.

## II. Negligence

Plaintiff also brings claims for negligence directly against DraftKings. Specifically, plaintiff alleges claims of negligent supervision and retention of its employees and negligent infliction of emotional distress. A claim for negligence requires: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Pasternack v. Lab'y Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015). Employers generally owe a "duty of care in supervising an employee" that "extends to any person injured by the employee's misconduct." *Sokola v. Weinstein*, 187 N.Y.S.3d 493, 500 (Sup. Ct.), *appeal withdrawn*, 194 N.Y.S.3d 474 (1st Dep't 2023). Thus, an employer may be held liable for negligence if its duty of supervision is breached and causes harm to a third party. *See id*. Such a claim for negligent hiring, supervision or retention requires a plaintiff to plead: "(1) that the tortfeasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of

15

the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and, (3) that the tort was committed on the employer's premises or with the employer's chattels." *Naughright v. Robbins*, No. 10-cv-08451, 2014 WL 5315007, at *8 (S.D.N.Y. Oct. 17, 2014); *see also Charlier v. 21 Astor Place Condo.*, No. 22-cv-05903, 2024 WL 4026253, at *7 (S.D.N.Y. Sept. 3, 2024).

As to plaintiff's claim of negligent supervision or retention, defendant contends plaintiff does not plead that DraftKings knew or should have known that its employees were allegedly allowing third parties to access plaintiff's personal information. Mot. 20–22. Plaintiff alleges that he informed defendant that the "upper echelon" of employees were in contact with a "dangerous individual" and that providing plaintiff's private information to Spanky risked extortion and physical violence to plaintiff. Am. Compl. ¶ 26. Plaintiff further alleges that defendant's employees allowed an unknown individual to change his account settings despite plaintiff's immediate efforts to inform defendant of the invalid change and protect his account. Am. Compl. ¶¶ 42–58. At this stage, these allegations sufficiently allege the "notice or prior knowledge element" of a claim for negligent supervision or retention. *See Sokola*, 187 N.Y.S.3d at 502. Furthermore, these allegations support a reasonable inference that any breach made use of DraftKings "chattel" through use of its technology systems. *See Naughright*, 2014 WL 5315007, at *8.

Defendant also argues that plaintiff's failure to plead the identity of the employee(s) makes the negligent retention claim "impossible." Mot. 21. However, plaintiff alleges that employees at DraftKings' "upper echelon" were involved with the information leak and that plaintiff emailed DraftKings and texted with Di Chiaro and another VIP host. Am. Compl. ¶ 43. Plaintiff therefore adequately alleges that the individuals responsible for the alleged breach of defendant's duty of care were employees

at DraftKings. *See Thornton v. City of New York*, No. 950356/2020, 2023 WL 4748983, at *1 (N.Y. Sup. Ct. July 19, 2023) (finding failure to identify employee by name was an inadequate ground to dismiss claim for negligent supervision and retention). Plaintiff's allegations that he put defendant on actual notice of the imminence and danger of a potential release or hack of his personal information by a DraftKings employee is sufficient at the pleading stage to allege that defendant owed him a duty of care, breached that duty, and caused plaintiff harm by its negligent supervision and retention of employees.

However, plaintiff's claim for negligent infliction of emotional distress must be dismissed. These claims "shall not be permitted to proceed separately" if they "mirror[]" or are otherwise "duplicative" of another cause of action sounding in tort. *C.T. v. Valley Stream Union Free Sch. Dist.*, 201 F. Supp. 3d 307, 327 (E.D.N.Y. 2016). Although plaintiff makes no argument as to this claim, *see generally* Opp'n, the Court construes the complaint as alleging that DraftKings negligently allowed the release of his personal information causing him injury. That is precisely the same ground for plaintiff's negligent supervision and retention claim. Accordingly, the claim for negligent infliction of emotional distress is dismissed.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss is **GRANTED in part**, **DENIED in part**. Plaintiff's claims for negligent and intentional infliction of emotional distress are **DISMISSED** without prejudice.

**SO ORDERED.**

                                                  /s/ Natasha C. Merle
                                                NATASHA C. MERLE
                                                United States District Judge

Dated:       March 7, 2025
                Brooklyn, New York